UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

FRANK CORRIDORE,

       Petitioner

v.                                  Case No.

HEIDI WASHINGTON, Director,
       Michigan Department of Corrections,

       Respondent.

_____/


**PETITION FOR HABEAS CORPUS**

**BRIEF IN SUPPORT**
**OF PETITION FOR HABEAS CORPUS**


ALONA SHARON (P68782)
Attorney for Petitioner
28411 Northwestern Highway
Suite 875
Southfield, MI 48034
(248) 545-4755
alonamac@aol.com

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

FRANK CORRIDORE,

         Petitioner

v.                                       Case No.

HEIDI WASHINGTON, Director,
         Michigan Department of Corrections,

         Respondent.

_____/


## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner FRANK CORRIDORE, by and through his attorney, ALONA SHARON, pursuant to 28 U.S.C. §2254, petitions this Honorable Court to grant him a Writ Habeas Corpus, and states:

1. Petitioner Frank Corridore is a United States Citizen, and a resident of Oakland County, Michigan, currently serving a term of Lifetime Electronic Monitoring ordered by the Oakland County Circuit Court, Case No. 16-258556-FH.

2. Petitioner Frank Corridore was convicted of 2d degree criminal sexual conduct and sentenced on April 27, 2017. It was alleged that he committed unlawful touching of a child, MC. After completing a prison term of 1 year 7

months to 15 years in prison, Petitioner remains under the supervision of the Lifetime Electronic Monitoring system of the Michigan Department of Corrections, under Respondent Heidi Washington, Director of the Department of Corrections.

3. On February 23, 2018, the Circuit Court denied the Motion for New Trial and Motion for Evidentiary Hearing. On July 25, 2018, the Michigan Court of Appeals denied a Motion to Remand for an evidentiary hearing. On June 27, 2019, the Michigan Court of Appeals affirmed the conviction, No. 338670. On April 15, 2020, the Michigan Supreme Court denied leave to appeal, No. 160130.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §2254 and §2241. Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. §2241 as this matter concerns a criminal proceeding that was adjudicated in Oakland County, Michigan.

5. **Issue I. Lifetime Electronic Monitoring as applied in Michigan constitutes "custody" for purposes of Habeas Corpus jurisdiction.** This is a matter of first impression. Petitioner has completed his term of imprisonment, but remains on Lifetime Electronic Monitoring (LEM) until his death. This entails a box physically attached to his leg, that broadcasts his whereabouts at all times. Petitioner is subject to a felony conviction for violation of the conditions of the monitoring program, including things such as removal of the box from his leg,

failure to maintain the monitoring device in working order, or failure to make the monthly payment. It also constitutes a search without probable cause under *Grady v. North Carolina*, 575 U.S. 306, 135 S. Ct. 1368, 191 L. Ed. 2d 459 (2015) and *Carpenter v. United States*, 138 S. Ct. 2206, 2210, 201 L. Ed. 2d 507 (2018). We submit that the LEM constitutes a "severe restraint[ ] on individual liberty" and therefore constitutes "custody" for Habeas Corpus purposes under *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cty., California*, 411 U.S. 345, 351, 93 S. Ct. 1571, 1574–75, 36 L. Ed. 2d 294 (1973), and other cases.

6. If it is a 4th Amendment violation to surveil Carpenter's location without probable cause, then it also is a 4th amendment violation to surveil Corridore's whereabouts without probable cause, UNLESS he is considered to be under state custody. In other words, either his location cannot be tracked without probable cause, or he is in custody sufficient to allow the deprivation of the privacy right without probable cause.

7. **Issue II. Petitioner Corridore was denied his right to due process and a fair trial as a result of the prosecutor's misconduct and counsel was ineffective for failing to object to that misconduct.** A defendant's due process right to a fair trial is implicated where the prosecutor resorts to improper and unjust methods. U.S. Const. Am XIV; *Donnelly v. DeChristoforo*, 416 U.S. 637, 642; 94 S.Ct. 1868; 40 L.Ed.2d 431 (1974). The prosecutor engaged in misconduct by

vouching for the prosecution witnesses and the guilt of Mr. Corridore.

8. The prosecutor engaged in misconduct by encouraging a conviction based on sympathy and a civic duty to protect the community. A civic duty argument, one that asks the jury to convict on improper considerations such as solving the crime problem or protecting children or helping the victim, diverting focus from whether there has been proof beyond a reasonable doubt to what outcome the witness would like, is improper. *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005).

9. Defense counsel committed ineffective assistance of counsel by failure to object. The prosecutor misconduct and failure to object were prejudicial.

10. **Issue III. Petitioner received ineffective assistance of counsel resulting in actual prejudice for several other reasons.** A criminal defendant is entitled to the effective assistance of counsel. U.S. Const. Amend. VI, U.S. Const. Amend. XIV; *Strickland v. Washington*, 466 U.S. 668; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984).

11. Trial Counsel was ineffective for failing to present expert testimony that was readily available from defense witness Dr. Katherine Jacobs, and that supported the defense theory. This suggested that her report issued pretrial was not read, or not paid attention to. The unnecessary shortcomings in the presentation of the expert testimony, a result of lack of due diligence by the attorney, kept critical

information from the jury, and were relied upon by the prosecution in closing arguments.

12. Trial Counsel was ineffective for failing to object to inadmissible hearsay testimony recounting out of court statements of MC.

13. Trial counsel was ineffective for failing to object to credibility vouching testimony and for eliciting credibility opinion and vouching statements from various witnesses. Counsel was also ineffective for eliciting opinion testimony regarding the credibility of the complainant.

14. Trial Counsel was ineffective for failing to object to the expert testimony of Sarah Visger Killips, who testified outside her area of expertise and who offered credibility vouching testimony.

15. Counsel was ineffective for eliciting inadmissible expert opinion testimony offered by a lay witness, a relative of MC.

16. **Issue IV. The state courts acted unreasonably by refusing to hold a requested evidentiary hearing on ineffective assistance of counsel.** Under clearly established United States Supreme Court case law, it is unreasonable for the trial court to make factual findings without holding an evidentiary hearing, and unreasonable state court rulings cannot be sustained. *Terry Williams v. Taylor*, 529 U.S. 362; 120 S.Ct. 1495; 146 L.Ed.2d 389 (2000); *Schriro v. Landrigan*, 550 U.S. 465 (2007). It was unreasonable here, where Petitioner needed to establish

the reasons for actions and inactions of the trial counsel, but was unable to elicit them without an evidentiary hearing. An evidentiary hearing was requested in the trial court, the Court of Appeals, and the Michigan Supreme Court, and unreasonably denied in all of them.

17. The decisions of the state courts denying relief on the above grounds were contrary to and involved an unreasonable application of clearly established Federal law; as determined by the United States Supreme Court. 28 U.S.C. §2254(d)(1). The state court decisions were also based on an unreasonable determination of the facts and a misreading of the lower court record. 28 U.S.C. §2254(d)(2).

## RELIEF REQUESTED

WHEREFORE, Petitioner Frank Corridore moves this Honorable Court to grant the following:

A.    Accept jurisdiction over this case;

B.    Require Respondent to appear and answer the allegations in this Petition and Brief in Support;

C.    Allow Petitioner to file such briefs and exhibits as this Court may require on the questions raised by Petition;

D.    Conduct an evidentiary hearing on ineffective assistance of counsel, or direct the state court to do so;

E.      Issue an Order granting Habeas Corpus relief requiring a new trial;

F.      Issue a Writ of Habeas Corpus freeing Petitioner from his unconstitutional deprivation of liberty.

G.      Grant such other further and different relief as the Court may deem just and proper under the circumstances.

Respectfully Submitted

/s/Alona Sharon
ALONA SHARON (P68782)
Attorney for Petitioner
28411 Northwestern Highway
Suite 875
Southfield, MI 48034
(248) 545-4755
alonamac@aol.com

DATED: April 14, 2021

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

FRANK CORRIDORE,

       Petitioner

v.                                        Case No.

HEIDI WASHINGTON, Director,
       Michigan Department of Corrections,

       Respondent.

_____/

**BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

ALONA SHARON (P68782)
Attorney for Petitioner
28411 Northwestern Hwy
Suite 875
Southfield, MI 48034
(248) 545-4755
alonamac@aol.com

1

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i
INDEX OF AUTHORITIES ....................................................................ii
STATEMENT OF QUESTIONS PRESENTED.....................................vii
STATEMENT OF JURISDICTION.......................................................viii
STATEMENT OF THE CASE ................................................................ 1
STANDARD OF REVIEW........................................................................ 8
ARGUMENT ……………………………………………………………..10

    I.    LIFETIME ELECTRONIC MONITORING AS APPLIED IN MICHIGAN CONSTITUTES "CUSTODY" FOR PURPOSES OF HABEAS CORPUS JURISDICTION. ................................. 10

    II.    PETITIONER CORRIDORE WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S MISCONDUCT AND COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THAT MISCONDUCT. ..................................................................... 23

    III. PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL RESULTING IN ACTUAL PREJUDICE WHERE HIS TRIAL COUNSEL (1) FAILED TO PRESENT TO THE JURY EXPERT TESTIMONY FROM DR. KATHERINE JACOBS THAT WAS SPECIFIC AND RELEVANT TO THE INSTANT CASE; (2) FAILED TO OBJECT TO INADMISSIBLE HEARSAY REPETITION OF MC'S ACCUSATIONS; (3) FAILED TO OBJECT TO CREDIBILITY VOUCHING STATEMENTS AND ELICITED OPINION TESTIMONY ABOUT MC'S CREDIBILITY; (4) FAILED TO OBJECT TO IMPROPER CREDIBILITY VOUCHING TESTIMONY FROM PROSECUTION EXPERT SARAH

VISGER KILLIPS; (5) ELICITED INADMISSIBLE EXPERT TESTIMONY FROM A LAY WITNESS. .................................. 31

IV. THE STATE COURTS ACTED UNREASONABLY BY REFUSING TO HOLD A REQUESTED EVIDENTIARY HEARING ON INEFFECTIVE ASSISTANCE OF COUNSEL. ................................................................. 73

RELIEF REQUESTED ............................................................. 75

# INDEX OF AUTHORITIES

**Cases**

*Bacilio-Sabastian v. Barr*, 980 F.3d 480, 482–83 (5th Cir. 2020) ......................... 10

*Bailey v. Wainwright*, 951 F.3d 343, 346 (6th Cir.), cert. denied,
141 S. Ct. 316 (2020) ................................................................... 16

*Beasley v. United States*, 491 F2d 687 (6th Cir. 1974) ................................... 32, 43

*Berger v. United States*, 295 U.S. 78, 88; 55 S.Ct. 629, 633;
79 L Ed 1315 (1935) ...................................................................... 23

*Brown v. Smith*, 551 F.3d 424, 434-435 (6th Cir. 2008) ..................................... 33

*Bruno v. Rushen*, 721 F2d 1193 (9th Cir. 1983) ......................................... 27, 29, 31

*Burgess v. Salmon*, 97 U.S. 381, 385, 24 L. Ed. 1104 (1878) ................................. 17

*Carafas v. LaVallee*, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) ... 10

*Carpenter v. United States*, 138 S. Ct. 2206, 2210, 201 L. Ed. 2d
507 (2018) ......................................................................... 13, 15, 17, 19

*Connecticut v. Taft*, 306 Conn 749, 764; 51 A3d 988 (2012) ................................ 58

*Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988) ........................................ 25, 56

*Corsa v. Anderson*, 443 F. Supp. 176 (ED Mich. 1977) ...................................... 70

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991) ....................................... 27

*Cuyler v. Sullivan*, 446 U.S. 335; 100 S.Ct. 1708; 64 L.Ed.2d 333 (1980) ............. 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 589;
113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) ................................................ 69

*Dennis v. United States*, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849,
16 L.Ed.2d 973 (1965) .................................................................. 45

*Doe v. Barr*, No. 19-CV-4887 (AJN), 2020 WL 4748297, at *4
(S.D.N.Y. Aug. 16, 2020) ............................................................... 21

*Donnelly v. DeChristoforo*, 416 U.S. 637; 94 S.Ct. 1868; 40 L.Ed.2d
431 (1974) ........................................................................... 23, 27

*Eberhardt v. Bordenkircher*, 605 F.2d 275, 278 (6th Cir. 1979) ........................... 30

*Gaines v. Hopper*, 575 F2d 1147 (5th Cir. 1978) .......................................... 43

*Grady v. North Carolina*, 575 U.S. 306, 135 S. Ct. 1368,
191 L. Ed. 2d 459 (2015) ............................................................... 14

*Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996) ........................................... 70

*Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1985) .......... 29

*Harrington v. Richter*, 562 U.S. 86 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) . 73

*Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999) ............................................ 43

*Hautzenroeder v. Dewine*, 887 F.3d 737, 740 (6th Cir. 2018) ...............................11

*Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cty., California*, 411 U.S. 345, 351, 93 S. Ct. 1571, 1574–75, 36 L. Ed. 2d 294 (1973)........................................................................3, 11, 15

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) .........................................23, 29, 30

*In re Winship*, 397 U.S. 358; 90 S. Ct. 1068; 25 L.Ed.2d 368 (1970) ...................26

*Johns v. Trierweiler*, No. 1:18-CV-954, 2019 WL 11274854, at *8 (W.D. Mich. Sept. 3, 2019) .......................................................................11

*Jones v. Cunningham*, 371 U.S. 236, 242–43, 83 S. Ct. 373, 377, 9 L. Ed. 2d 285 (1963).................................................................12, 15, 16, 21

*Kowalak v. United States*, 645 F.2d 534, 537-538 (6th Cir. 1981).......................70

*Kusay v. United States*, 62 F.3d 192, 193 (7th Cir.1995) .....................................16

*Kyles v. Whitley*, 514 U.S. 419; 115 S. Ct. 1555; 131 L.Ed.2d 490 (1995)............71

*Lawrence v. 48th Dist. Court*, 560 F.3d 475, 479 (6th Cir. 2009) ..........................16

*Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–478, 110 S.Ct. 1249, 1254, 108 L.Ed.2d 400 (1990)....................................................21

*Lonchar v. Thomas*, 517 U.S. 314; 116 S.Ct. 1293; 134 L.Ed.2d 440 (1996)........22

*Lord v. Wood*, 184 F.3d 1097 (9th Cir. 1999)........................................................44

*Lucas v. O'Dea*, 179 F.3d 412 (6th Cir. 1999) ......................................................30

*Maleng v. Cook*, 490 U.S. 488 (1989) ..................................................................10

*Marshall v. Lonberger*, 459 U.S. 422; 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ........9

*Martin v. Rose*, 747 F2d 1245 (CA 6, 1984) ........................................................69

*Mathis v. Stewart*, No. 2:16-CV-14292, 2017 WL 5903460, at *8 (E.D. Mich. Nov. 30, 2017) ..................................................................16

*McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996) ...................................70

*Michigan v. Long*, 463 U.S. 1032; 103 S.Ct. 3469; 77 L.Ed.2d 1201 (1983) ........19

*Old Chief v. United States*, 519 U.S. 172; 117 S. Ct. 644; 136 L.Ed.2d 574 (1997)..........................................................................30, 72

*Oregon v. Kennedy*, 456 U.S. 667; 102 S.Ct. 2083; 72 L.Ed.2d 416 (1982)..........25

*Pavel v. Hollins*, 261 F.3d 210 , 223 (2d Cir. 2001) .............................................55

*People v. Abraham*, 256 Mich. App. 265, 279 (2003)............................................40

*People v. Armstrong*, 490 Mich. 281; 806 N.W.2d 676 (2011)..............................41

*People v. Buckey*, 424 Mich. 1, 17; 378 NW2d 432 (1985.....................................57

*People v. Clark*, 340 Mich. 411; 65 N.W.2d 717 (1954).........................................56

*People v. Cole*, 491 Mich. 325, 327, 335; 817 N.W.2d 497, 498, 502 (2012) .......17

*People v. Dobek*, 274 Mich. App. 58, 71 (2007) ...................................................57

*People v. Douglas*, 496 Mich. 557; 852 N.W.2d 587 (2014) .................................53

iv

*People v. Earl,* 495 Mich. 33, 37–39; 845 NW2d 721 (2014) ............................... 17

*People v. Gee,* 406 Mich. 279, 282; 278 N.W.2d 304 (1979) ............................... 49

*People v. Humphreys,* 24 Mich. App. 411, 418-420; 180 N.W.2d 328 (1970) ...... 56

*People v. Montgomery,* 22 Mich. App. 87; 176 N.W.2d 697 (1970) .................... 56

*People v. Musser,* 494 Mich. 337, 835 N.W.2d 319 (2013) ................................. 57

*People v. Peterson,* 450 Mich. 349, 352; 537 N.W.2d 857 (1995)................... 56, 63

*People v. Smith,* 158 Mich. App. 220, 230-31; 405 N.W.2d 156 (1987) ......... 56, 57

*People v. Straight,* 430 Mich. 418; 424 N.W.2d 257 (1988) ........................... 52, 55

*People v. Thorpe,* 504 Mich. 230, 934 N.W.2d 693 (2019) ............................ 64, 65

*Piasecki v. Court of Common Pleas, Bucks Cty., PA,* 917 F.3d 161,
    166 (3d Cir.), cert. denied sub nom. *Court of Common Pleas of
    Pennsylvania v. Piasecki,* 140 S. Ct. 482, 205 L. Ed. 2d 267 (2019)................. 11

*Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334–35,
    45 L.Ed.2d 272 (1975).......................................................................................... 21

*Rickman v. Bell,* 131 F3d 1150 (CA 6, 1997) ....................................................... 55

*Roe v. Flores-Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145
    L.Ed.2d 985 (2000).............................................................................................. 73

*Satterlee v. Wolfenbarger,* 374 F. Supp. 2d 562 (E.D. Mich. 2005),
    453 F.3d 362 (6th Cir. 2006) ............................................................................... 75

*Sawyer v. Hofbauer,* 299 F.3d 605, 610-11 (6th Cir. 2002) ................................. 75

*Schriro v. Landrigan,* 550 U.S. 465; 127 S.Ct. 1933; 167 L.Ed.2d 836 (2007) ..... 74

*Seehan v. State of Iowa,* 37 F.3d 389 (8th Cir. 1994) ........................................... 70

*Shepard v. United States,* 290 U.S. 96; 54 S. Ct. 22; 78 L Ed 196 (1933) ............ 28

*Sims v. Livesay,* 970 F2d 1575 (6th Cir. 1992) ..................................................... 43

*Smith v. Bauman,* No. 5:10-CV-11052, 2018 WL 1399312, at *5
    (E.D. Mich. Mar. 19, 2018), aff'd, No. 18-1385, 2019 WL
    4865345 (6th Cir. June 25, 2019) .................................................................. 16, 17

*Spencer v. Kemna,* 523 U.S. 1, 7–8, 118 S. Ct. 978, 983,
    140 L.Ed.2d 43 (1998)..................................................................................... 20, 21

*State v. Grady,* 372 N.C. 509, 831 S.E.2d 542 (2019)....................................... 3, 14

*Strickland v. Washington,* 466 U.S. 668; 104 S. Ct. 2052;
    80 L.Ed.2d 674 (1984)..................................................................................passim

*Sullivan v. Fairman,* 819 F2d 1382 (7th Cir. 1987)............................................. 43

*Taylor v. Kentucky,* 436 U.S. 478; 98 S.Ct. 1930; 56 L.Ed.2d 468 (1978) ........... 47

*Taylor v. Mattox,* 366 F.3d 992 (9th Cir. 2004)................................................... 74

*Terry Williams v. Taylor,* 529 U.S. 362; 120 S.Ct. 1495; 146
    L.Ed.2d 389 (2000)........................................................................................ 8, 74

v

*Ulster County Court v. Allen*, 442 U.S. 140; 99 S. Ct. 2213;
  60 L.Ed.2d 777 (1979)..........................................................................26
*United States v. Bailey*, 444 U.S. 394, 414; 100 S.Ct. 624;
  62 L.Ed.2d 575 (1980)..........................................................................57
*United States v. Barker*, 553 F2d 1013 (6th Cir. 1977) ...........................27
*United States v. Cronic*, 466 U.S. 648; 104 S. Ct. 2039; 80 L.Ed.2d 657 (1984) ..37
*United States v. DeLoach*, 504 F.2d 185 (D.C.Cir. 1974) ........................27
*United States v. Harber*, 53 F.3d 236 (9th Cir. 1995) .............................57
*United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 949,
  181 L. Ed. 2d 911 (2012).......................................................................13
*United States v. Lachman*, 48 F.3d 586 (1st Cir. 1995)...........................25
*United States v. McLain*, 823 F2d 1457 (11th Cir. 1987)............27, 29, 30
*United States v. Merriweather*, 78 F3d 1070 (6th Cir. 1996) ..................28
*United States v. Monaghan*, 741 F.2d 1434 (D.C.Cir. 1984) ...................27
*United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987) .....................27, 65
*United States v. Phillips*, 600 F2d 535 , 538-539 (5th Cir. 1979) ...........25
*United States v. Porterfield*, 624 F2d 122 (10th Cir. 1980)....................43
*United States v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983)........................70
*United States v. Sandles*, 469 F.3d 508, 517–18 (6th Cir.2006).............16
*United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261,
  140 L.Ed.2d 413 (1998)....................................................................23, 56
*United States v. Schrock*, 855 F2d 327 (CA 6, 1988) ........................28, 29
*United States v. Young*, 470 U.S. 1, 105 SCt 1038, 84 LEd2d 1 (1985) ...............24
*Viereck v. United States*, 318 U.S. 236; 63 S. Ct. 561; 87 L Ed 734 (1943) .........27
*Ward v. United States*, 995 F2d 1317 (CA 6, 1993) ...............................55
*Washington v. Hofbauer*, 228 F3d 689 (CA 6, 2000) ...................32, 38, 46
*West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) ......................................9
*Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985).........................70
*Wilson v. Cowan*, 578 F2d 166 (6th Cir. 1978) ......................................43
*Workman v. Tate*, 957 F2d 1339 (CA 6, 1992)........................................40
*Ykimoff v. Foote Mem. Hosp.*, 285 Mich. App. 80, 106,
  776 N.W.2d 114, 130 (2009):...............................................................49

## Constitutional Provisions

U.S. Const. Amend. IV ..............................................................................20
US Const, Amend. VI ................................................................................32

U.S. Const. Amend. XIV .......................................................................... 3, 23, 56

**Statutes**

28 U.S.C. § 2241 ...................................................................................... 2, 10

28 U.S.C. § 2254 ............................................................................. 7, 9, 10, 75

28 U.S.C. §2254(d) ......................................................................................... 7

M.C.L. 28.723 ............................................................................................... 10

M.C.L. 28.729 ............................................................................................... 10

M.C.L. 750.520c(2)(b) .................................................................................. 10

M.C.L. 750.520n ..................................................................................... 10, 13

M.C.L. 791.285 ....................................................................................... 10, 13

N.G.C.S. § 14-208.40A(c) ............................................................................ 15

N.G.C.S. § 14-208.40B(c) ............................................................................ 15

**Other Authorities**

M Crim JI 2.03 ............................................................................................. 40

M Crim JI 3.05 ............................................................................................. 40

**Rules**

M.C.R. 6.201 .......................................................................................... 44, 45

M.C.R. 6.201(A)(3) ...................................................................................... 44

M.R.E. 702 ................................................................................................... 63

M.R.E. 801, 802 ........................................................................................... 47

M.R.E. 802 ................................................................................................... 47

M.R.E. 803(2) .............................................................................................. 49

**Treatises**

McCormick on Evidence, §185, at 545 (1984) ...................................... 28, 29

McCormick, Evidence (3d ed), §297, p 855 ................................................ 49

# STATEMENT OF QUESTIONS PRESENTED

I.    WHETHER LIFETIME ELECTRONIC MONITORING AS APPLIED IN MICHIGAN CONSTITUTES "CUSTODY" FOR PURPOSES OF HABEAS CORPUS JURISDICTION.

       Petitioner answers "Yes".

II.   WHETHER PETITIONER CORRIDORE WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S MISCONDUCT AND COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THAT MISCONDUCT.

       Petitioner answers "Yes".

III.  WHETHER PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL RESULTING IN ACTUAL PREJUDICE WHERE HIS TRIAL COUNSEL (1) FAILED TO PRESENT TO THE JURY EXPERT TESTIMONY FROM DR. KATHERINE JACOBS THAT WAS SPECIFIC AND RELEVANT TO THE INSTANT CASE; (2) FAILED TO OBJECT TO INADMISSIBLE HEARSAY REPETITION OF MC'S ACCUSATIONS; (3) FAILED TO OBJECT TO CREDIBILITY VOUCHING STATEMENTS AND ELICITED OPINION TESTIMONY ABOUT MC'S CREDIBILITY; (4) FAILED TO OBJECT TO IMPROPER CREDIBILITY VOUCHING TESTIMONY FROM PROSECUTION EXPERT SARAH VISGER KILLIPS; (5) ELICITED INADMISSIBLE EXPERT TESTIMONY FROM A LAY WITNESS.

       Petitioner answers "Yes".

IV.   WHETHER THE STATE COURTS ACTED UNREASONABLY BY REFUSING TO HOLD A REQUESTED EVIDENTIARY HEARING ON INEFFECTIVE ASSISTANCE OF COUNSEL.

       Petitioner answers "Yes".

# STATEMENT OF JURISDICTION

Petitioner Frank Corridore was convicted of 2d degree criminal sexual conduct. The appeal of right was rejected at the Michigan Court of Appeals, which affirmed June 17, 2019. Michigan Supreme Court denied leave to appeal on April 15, 2020. The time to apply to the United States Supreme Court expired on July 14, 2020. The instant petition is filed within one year of that date.

Petitioner discharged from formal parole on October 30, 2020. However, he continues to be under lifetime Sex Offender Registration (SOR), and Lifetime Electronic Monitoring (LEM). Whether he continues to be in "custody" for purposes of 28 U.S.C. § 2241 and 28 U.S.C. § 2254 is the subject of Issue I, infra.

# STATEMENT OF THE CASE

## *Statement of Proceedings*

Petitioner Frank Corridore was convicted of one count of Criminal Sexual Conduct-2nd Degree, following a several day jury trial before the Honorable Denise Langford Morris in the Oakland County Circuit Court, Case No. 16-258556-FH. It was alleged that he unlawfully touched his granddaughter. Mr. Corridore's first trial resulted in a hung jury (mistrial). At the second trial, which contained the errors complained of in this petition, Petitioner was convicted. On April 27, 2017, he was sentenced to 1 year 7 months to 15 years in prison, lifetime Sex Offender Registration (SOR), and Lifetime Electronic Monitoring (LEM).

On February 23, 2018, the Circuit Court denied the Motion for New Trial and Motion for Evidentiary Hearing, Exh. 1. On July 25, 2018, the Michigan Court of Appeals denied a Motion to Remand for an evidentiary hearing, Exh. 2. On June 27, 2019, the Michigan Court of Appeals affirmed the conviction, Exh. 3. On April 15, 2020, the Michigan Supreme Court denied leave to appeal, Exh. 4.

## *Statement of Facts*

MC, a minor, testified that she spent Christmas 2015 in Michigan with her grandparents and other family members. (TT II, 67-68). MC alleged that her grandfather, Frank Corridore, placed his hand down her pants and touched the

1

outside of her vagina. (TT II, 71). [1] She was with her cousins and her brother and they were all called for breakfast. She was the last person to leave the room and when she got up her grandfather came up behind her and slipped his hand down her pants. (TT II, 73). MC could not remember how many times this happened. She could not remember the first time it happened. (TT II, 76-77).

MC also testified that on January 23, 2016, her grandfather texted her and asked to FaceTime with her in private. This happened during a sleepover she was having with her friend Shane. MC explained that her grandfather did not like Shane and he often warned MC to keep her distance from Shane. (TT, 91-92). He did not like Shane because he claimed to have walked in on MC and Shane and saw Shane with her head between MC's legs, while the girls were naked. MC denied that this ever happened but acknowledged that her grandfather thought that that was what he saw. (TT II, 92). During the sleepover he asked MC to leave her

[1] Transcripts are cited hereinafter as set forth below followed by page number
Jury Trial, Volume 1, March 20, 2017= TT I
Jury Trial, Volume 2, March 21, 2017 = TT II
Jury Trial, Volume 3, March 22, 2017 = TT III
Jury Trial, Volume 4, March 23, 2017 = TT IV
Jury Trial, Volume 5, March 24, 2017 = TT v.
Jury Trial, Volume 6, March 27, 2017 = TT VI
Jury Trial, Volume 7, March 28, 2017 = TT VII
Jury Trial, Volume 8, March 29, 2017 = TT VIII
Jury Trial Volume 9, March 30, 2017 = TT IX
Sentencing, April 27, 2017 = ST
Additional references will be made to Mr. Corridore's first trial and will indicated as "See First Trial."

bedroom, where Shane was, and asked MC to go into the bathroom, where he FaceTimed with her. (TT II, 96). MC alleged that while they were FaceTiming, her grandfather asked her to show him "what's down there." MC interpreted his request as him asking to see her vagina. (TT II, 87-98). After ending the conversation and leaving the bathroom, MC told Shane that is what happened. (TT II, 101), and told her parents that is what happened.

Celina Corridore, MC's mother testified that the family spent Christmas 2015 with the Corridore family in Michigan and the holiday was wonderful. (TT III, 50- 52). They drove home after Christmas and everything seemed fine. (TT III, 51). On January 23, 2016, MC had a sleepover with her friend Shane and it was routine, Celina was not aware of any problems. (TT III, 52). The Tuesday following the sleepover she received a phone call from Shane's mother, Beth, who indicated that she needed to speak with both Celina and her husband Marco. (TT III, 53). She called Beth right away and after speaking with Beth she looked at MC's phone. She saw that there was a FaceTime call between Mr. Corridore and MC the night of the sleepover. (TT III, 55-63). After looking at MC's text messages Celina thought "clearly something happened." (TT III, 68).

The following day, after school, MC came to her mother's home office to say hello. (TT III, 69). Celina described MC's demeanor as normal, just like any other day. (TT III, 73). Celina tried to approach the subject of the FaceTime call

with MC but MC just looked confused. (TT III, 75- 76). MC's mother asked again and MC still looked confused. She asked a third time and MC tried to tell her about an incident with Shane during the sleepover. (TT III, 77-79). Celina then asked her if something else happened during the sleepover and MC's demeanor immediately changed. According to Celina, MC's face became flushed, she was upset and began crying. (TT III, 80-82). MC told her that something happened but she did not want to tell. She said it was about Nono (her nickname for Mr. Corridore) but she did not want to get him into trouble. She then cried even harder. Celina was then allowed to provide details of what MC allegedly told her about the FaceTime event. (TT III, 85). When MC made the statements, she thought "something had happened." (TT III, 66). Celina then testified that MC spontaneously accused him of additional misconduct, that when they visit Michigan her grandfather puts his hands down her pants. (TT III, 87).

At this point, Celina brought her husband Marco into the conversation. Celina asked MC to repeat everything she just said to Marco. At the end of all of this testimony defense counsel asked how the prosecution was hoping to get this testimony in, was it under present sense impression or excited utterance. (TT III, 89). The prosecution indicated under both theories. Defense counsel was then given an opportunity to voir dire Celina regarding MC's demeanor during her

discussion and ultimately withdrew his objection to the hearsay testimony. (TT III, 91).

Celina testified that Marco asked MC how many times the touching happened and MC indicated she didn't know but it happened all the time. (TT III, 92). That statement was allowed as an excited utterance over defense objection. Celina continued to testify about Marco's exact conversation with MC. She recounted the questions he posed to MC and the answers that MC provided. This was allowed without objection from defense counsel. (TT III, 93-94). Celina was allowed to testify to MC's accusations of additional bad acts. (TT III, 94-97). There was no objection from defense counsel. Celina explained that she refreshed her memory from an email that she wrote to Mary Corridore on March 2, 2016.

During cross examination of Celina Corridore, defense counsel elicited opinion testimony from her that she did not think MC could make up the allegations. (TT III, 137). He also asked her about the March 2, 2016, email in which she told Mary Corridore that the investigating detective (Detective O'Dea) found MC credible. (TT III, 151).

Detective O'Dea testified that it is his job to discover the truth and if he thinks there is enough probable cause in a case, he submits it to the prosecutor's office for charges. (TT IV, 6-10). He explained that his commanding officer reviews cases and if he thinks a case requires follow up and if it is a "strong case"

it will be forwarded to him for review. (TT IV, 7). The detective testified that MC was only able to be specific about one incident (TT IV, 92). The detective testified about three separate incidents that MC "disclosed" to him. (TT III, 117-118). He also testified that he thought MC's "disclosure" (accusation) was powerful and that he believed MC was telling the truth. (TT IV, 132). He repeated that he knows MC is telling the truth because he has several facts in evidence. (TT IV, 132). The detective reiterated that he knew the allegations were true. (TT IV, 141).

Marco Corridore, MC's father, testified that he is a doctor and has seen abuse at work and has had training in detecting abuse. (TT V, 171-172, 216). He described MC as upset when she initially started talking to him about the FaceTime incident but she did not cry. (TT V, 175). She was very matter of fact about everything. She described events very calmly, explicitly and simply. (TT V, 176). Marco noted that MC was very calm when discussing the allegation of Mr. Corridore placing his hands down her pants. (TT V, 254). He believed this was because she was groomed to think it was normal behavior. (TT V, 254). Marco provided details about MC's statements and described her accusation as succinct and eloquent, with precise language and without ambiguity. (TT V, 258-260). During Marco's testimony he testified to what Beth told them happened at the sleepover. (TT V, 221-222).

Marco Corridore testified that in his mind his father was guilty and he

never considered the possibility that his father was not guilty because of the innocence and sincerity of his daughter. (TT VI, 67). At the conclusion of Marco's testimony, a juror submitted a question to him, wanting to know what he thought when his father decided to stay in Mexico when the allegations surfaced. Defense counsel did not object to the question and Marco responded that he thought his father was guilty and he was acting in a way that an innocent person would not act. (TT VI, 105).

Sarah Visker Killips testified for the prosecution as an expert in forensic interviewing. (TT VI, 111). Her testimony is discussed in detail in Argument III(d). The defense presented testimony from Dr. Katherine Jacobs who was accepted as an expert in the areas of forensic interviewing, forensic interview techniques, patterns of disclosure of sexual abuse, memory and suggestibility and child and adolescent development. (TT VI, 211). Her testimony is discussed in detail in Argument III(a).

The defense presented additional witnesses including Maria Corridore and Mary Corridore, to counter the prosecution's case. Frank Corridore also testified in his defense, denying any wrongdoing.

## STANDARD OF REVIEW

Federal statute 28 U.S.C. §2254(d) sets forth the standard to be used by a Habeas Corpus court in reviewing state court rulings:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Terry Williams v. Taylor*, 529 U.S. 362; 120 S.Ct. 1495; 146 L.Ed.2d 389 (2000) sets forth the standard to be used in determining whether a decision is "contrary to" federal law:

> "The simplest and first definition of "contrary to" as a phrase is "in conflict with." Webster's Ninth New Collegiate Dictionary 285 (1983). In this sense, we think the phrase surely capacious enough to include a finding that the state-court "decision" is simply "erroneous" or wrong.
> …
> In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody--or, as in this case, his sentence of death--violates the Constitution, that independent judgment should prevail."

The legal rule that requires federal court deference to state court reasonable rulings of fact has no applicability to a conclusion of law. 28 U.S.C. § 2254(e); *Marshall v. Lonberger*, 459 U.S. 422; 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Cuyler v. Sullivan*, 446 U.S. 335; 100 S.Ct. 1708; 64 L.Ed.2d 333 (1980). Where state court findings are unreasonable, there should be no deference to those findings. 28 USC § 2254 (d)(2); *West v. Seabold,* 73 F.3d 81, 84 (6th Cir. 1996). De novo review is applied to issues not expressly ruled upon in state court. *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011).

**ARGUMENT**

**I.   LIFETIME ELECTRONIC MONITORING AS APPLIED IN MICHIGAN CONSTITUTES "CUSTODY" FOR PURPOSES OF HABEAS CORPUS JURISDICTION.**

Petitioner is no longer on probation or parole for the underlying conviction.   28 U.S.C. § 2241 and 28 U.S.C. § 2254 require that, at the time the petition is filed, the petitioner must be in custody pursuant to the judgment of a State court. *Maleng v. Cook*, 490 U.S. 488 (1989).   *Maleng* holds that a person on parole is still in custody.

Petitioner remains under twin burdens for life:   lifetime electronic monitoring (LEM) and sex offender registration (SOR).   M.C.L. 750.520c(2)(b); M.C.L. 750.520n; M.C.L. 791.285; M.C.L. 28.723; M.C.L. 28.729.   Whether LEM constitutes custody for Habeas Corpus jurisdiction is a question of first impression. Under *Bacilio-Sabastian v. Barr*, 980 F.3d 480, 482–83 (5th Cir. 2020):

> "To maintain a habeas case after release from incarceration, petitioners must show that they continue to suffer "collateral consequences." *See Carafas v. LaVallee*, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). In the criminal context, collateral consequences exist when, "[b]ecause of ... disabilities or burdens which may flow from [a] petitioner's conviction, he has a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed                             on                             him."

> "Under Michigan statute, lifetime electronic monitoring must "[b]y electronic means, track the movement and location of each individual from the

time the individual is released on parole or from prison until the time of the individual's death." Mich. Comp. Laws § 791.285." *Johns v. Trierweiler*, No. 1:18-CV-954, 2019 WL 11274854, at *8 (W.D. Mich. Sept. 3, 2019).

"The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty." *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cty., California*, 411 U.S. 345, 351, 93 S. Ct. 1571, 1574–75, 36 L. Ed. 2d 294 (1973). The question at bar is whether LEM constitutes a "severe restraint[ ] on individual liberty."

Courts have ruled differently on the question of whether sex offender registration (a lesser burden than LEM) constitutes custody. [2] In the Third Circuit, SOR alone is sufficient to constitute custody for Habeas Corpus purposes. *Piasecki v. Court of Common Pleas, Bucks Cty., PA*, 917 F.3d 161, 166 (3d Cir.), cert. denied sub nom. *Court of Common Pleas of Pennsylvania v. Piasecki*, 140 S. Ct. 482, 205 L. Ed. 2d 267 (2019). The Sixth Circuit has taken the opposite position, and has held that SOR does not constitute custody. *Hautzenroeder v. Dewine*, 887 F.3d 737, 740 (6th Cir. 2018).

---

[2]     We are not arguing here that the penalty of LEM is unconstitutional, which is not an exhausted issue. We do argue that where the Supreme Court has held that LEM constitutes a search, and a state Supreme Court has found it to be an unreasonable search, LEM would surely qualify as a severe burden on liberty, and therefore qualify as custody.

In *Jones v. Cunningham*, 371 U.S. 236, 242–43, 83 S. Ct. 373, 377, 9 L. Ed. 2d 285 (1963) the Supreme Court found that the conditions of that petitioner's parole were sufficient to constitute custody, and discussed at length the principles used to determine whether burdens placed on a convicted person constitute custody:

> "Petitioner must not only faithfully obey these restrictions and conditions but he must live in constant fear that a single deviation, however slight, might be enough to result in his being returned to prison to serve out the very sentence he claims was imposed upon him in violation of the United States Constitution. He can be rearrested at any time the Board or parole officer believes he has violated a term or condition of his parole, and he might be thrown back in jail to finish serving the allegedly invalid sentence with few, if any, of the procedural safeguards that normally must be and are provided to those charged with crime. It is not relevant that conditions and restrictions such as these may be desirable and important parts of the rehabilitative process; what matters is that they significantly restrain petitioner's liberty to do those things which in this country free men are entitled to do. Such restraints are enough to invoke the help of the Great Writ. Of course, that writ always could and still can reach behind prison walls and iron bars. But it can do more. It is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty. While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board within the meaning of the habeas corpus statute; if he can prove his allegations this custody is in violation of the Constitution, and it was therefore error for the Court of Appeals to dismiss his case as moot instead of permitting him to add the Parole Board members as respondents."

With those general principles in mind, we must look at what LEM

entails.

M.C.L. 791.285 provides that the Michigan Department of Corrections shall oversee the whereabouts of the Petitioner until his death, accomplished by a physical device (GPS, or global positioning system) attached to the Petitioner's body (in this case, the leg). The whereabouts of Petitioner are monitored by GPS, are recorded at all times, and are subject to retrieval by police. Petitioner pays $60 per month for the monitoring. M.C.L. 791.285. Petitioner is subject to a felony conviction for violation of the conditions of the monitoring program, including things such as removal of the box from his leg, failure to maintain the monitoring device in working order, or failure to make the monthly payment. M.C.L. 750.520n.

In *United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911 (2012), the Court stated: "We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a "search" subject to warrant requirements. In *Carpenter v. United States*, 138 S. Ct. 2206, 2210, 201 L. Ed. 2d 507 (2018), the Supreme Court ruled that tracking one's position and movements via tracking a cell phone constituted a search subject to the warrant requirements.

Certainly, under this authority, the installation of a GPS monitor on Petitioner's body constitutes a search. Under Michigan law, this search is

perpetual in nature, not ending until Petitioner's death.

The Michigan LEM program is similar to the satellite-based monitoring program (SBM) once applicable in North Carolina, though the persons to whom it applies are different (a non-violent sex offender is subject to SBM only if a recidivist, whereas under Michigan law a non-violent sex offender who is not a repeat offender is still subject to LEM under M.C.L. 750.520c).

In *Grady v. North Carolina*, 575 U.S. 306, 135 S. Ct. 1368, 191 L. Ed. 2d 459 (2015), the Supreme Court held that SBM constituted a search, holding: "The State's program is plainly designed to obtain information. And since it does so by physically intruding on a subject's body, it effects a Fourth Amendment search." They remanded for a determination of whether it constituted a reasonable search.

On remand from the Supreme Court the Court in *State v. Grady*, 372 N.C. 509, 831 S.E.2d 542 (2019) found the SBM program unconstitutional for non-violent sex offenders discharged from parole (such as Petitioner), required simply because they were recidivists (Petitioner is not), because of "the intrusiveness of mandatory lifetime SBM upon that individual's legitimate expectations of privacy."

In finding the SBM program unconstitutional as to nonviolent offenders, *Grady* focused on the Fourth Amendment protection against unreasonable searches and seizures:

The SBM program "present[s] even greater privacy concerns than the" CSLI considered in *Carpenter*. Id. at 2218. While a cell phone tracks more closely the movements of its owner than the bugged container in *Knotts* or the car in *Jones* because it is "almost a 'feature of human anatomy,' " …

In sum, we hold that recidivists, as defined by the statute, do not have a greatly diminished privacy interest in their bodily integrity or their daily movements merely by being also subject to the civil regulatory requirements that accompany the status of being a sex offender. The SBM program constitutes a substantial intrusion into those privacy interests without any showing by the State that the program furthers its interest in solving crimes that have been committed, preventing the commission of sex crimes, or protecting the public. In these circumstances, the SBM program cannot constitutionally be applied to recidivists in Grady's category on a lifetime basis as currently required by the statute.

## CONCLUSION

For the reasons stated, we hold that the application of the relevant portions of N.G.C.S. §§ 14-208.40A(c) and 14-208.40B(c) to individuals in the same category as defendant, under which these individuals are required to submit to a mandatory, continuous, nonconsensual search by lifetime satellite-based monitoring, violates the Fourth Amendment to the United States Constitution.

In the Sixth Circuit, *In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016), decided whether a change in sentence adding the monitoring requirement allowed that petitioner to challenge the additional requirement in federal Habeas Corpus.

They held that he could, because:

"he is subject to "significant" post-release "restraints on [his] liberty" that are "not shared by the public generally." *Jones v. Cunningham*, 371 U.S. 236, 238, 240, 242, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *see Hensley v. Mun. Court*, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). Individuals subject to post-release control, like individuals subject to

supervised release in the federal system, satisfy the "in custody" requirement. *See, e.g.*, *United States v. Sandles*, 469 F.3d 508, 517–18 (6th Cir.2006); *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir.1995).

We submit that, consistent with *Stansell*, the box on the leg for life and perpetual monitoring of movements is a significant post-release restraint on Petitioner's liberty that is "not shared by the public generally."

In *Lawrence v. 48th Dist. Court*, 560 F.3d 475, 479 (6th Cir. 2009), the Sixth Circuit held that being on personal bond was custody for Habeas Corpus purposes. The Court held: "Actual physical custody is sufficient but not necessary to satisfy the custody requirement. *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)." We submit that LEM is substantially more burdensome than personal bond, and therefore qualifies as custody.

In *Bailey v. Wainwright*, 951 F.3d 343, 346 (6th Cir.), cert. denied, 141 S. Ct. 316 (2020), the Court held: "The words "in custody" convey any conditions that "significantly restrain" a petitioner's "liberty".

In *Smith v. Bauman*, No. 5:10-CV-11052, 2018 WL 1399312, at *5 (E.D. Mich. Mar. 19, 2018), aff'd, No. 18-1385, 2019 WL 4865345 (6th Cir. June 25, 2019), the Court held that LEM for violent criminal sexual conduct "is not cruel and unusual punishment." Therefore, it is recognized as punishment. In accord see *Mathis v. Stewart*, No. 2:16-CV-14292, 2017 WL 5903460, at *8 (E.D. Mich. Nov. 30, 2017), finding that applying LEM retroactively violated the *ex post facto*

clause:

> "Finally, defendant argues that the trial court erred in sentencing her to lifetime electronic monitoring because it violated the ex post facto clauses of the federal and Michigan Constitutions. The prosecution agrees, admitting that lifetime electronic monitoring was not a punishment for the crimes committed by defendant at the time she committed them. See *People v. Earl,* 495 Mich. 33, 37–39; 845 NW2d 721 (2014). We agree and conclude that the trial court erred by sentencing defendant to lifetime electronic monitoring."

It is a general principle that "the *ex post facto* effect of a law cannot be evaded by giving a civil form to that which is essentially criminal." *Burgess v. Salmon*, 97 U.S. 381, 385, 24 L. Ed. 1104 (1878). Similarly, the custodial effect of a law cannot be evaded by labeling a lifetime of punishment as something other than punishment.

As the Court held in *Smith v. Bauman*, supra: "The Michigan Supreme Court, however, has held that "mandatory lifetime electronic monitoring is part of the sentence itself" and, therefore, "it is a direct consequence of a guilty or no-contest plea to a charge of [first-degree criminal sexual conduct] ... when the defendant is sentenced to prison." *People v. Cole*, 491 Mich. 325, 327, 335; 817 N.W.2d 497, 498, 502 (2012)."

LEM requires a lifetime of deprivation of privacy rights recognized by the court in *Carpenter v. United States*, 138 S. Ct. 2206, 2217, 201 L. Ed. 2d 507 (2018). If Petitioner can be deprived of a lifetime of privacy rights, without

probable cause to believe the surveillance will provide evidence of a crime, that has to be considered custody.

Petitioner Corridore, at any time, may be incarcerated for violating the rules relating to LEM. His liberty is restrained with a "mark of Cain" (a visible box that forever declares to everyone who sees him his supposedly terminated sex crime conviction). Normally, only prison guards can tell a person what to wear. Where the law continues to tell Petitioner what to wear, for the rest of his life, it is hard to call that anything but custody.

If a judge orders a convicted person to wear only red clothing for the rest of his life, or requires him to wear a top hat at all times, that would be a significant intrusion on liberty. If a judge orders a convicted person to wear a cumbersome, uncomfortable box for the rest of his life, that is an even greater intrusion on liberty.

The LEM subjects Petitioner to a lifetime of the inconvenience and physical discomfort of a box on his leg. Petitioner's punishment is not ended until that box is removed. To be forced to wear the box is physical punishment, that lasts far beyond the release from parole. He is subjected to parole-like conditions the rest of his life. He cannot go where he wants. There is a perpetual "search" under the 4th Amendment in the surveillance and reporting of his whereabouts, yet, there is no probable cause to believe that evidence of a crime will be found,

This is "just in case" surveillance.

Prisoners and parolees, recognized as being in custody, are subject to having their actions monitored. The argument that dropping some conditions but retaining the biggest condition of all: a box on your leg monitoring you for life, somehow makes it "not custody" is untenable. Many probationers and parolees in the U.S. are subject to far less intrusion than that imposed on Petitioner for life. If that is custody, then so is continued surveillance without probable cause to believe evidence of a crime will be found.

We submit a lifetime of subjection to unreasonable searches under *Carpenter*, that is, routine gathering of a person's whereabouts without probable cause, qualifies as custody. If it is a 4th Amendment violation to surveil Carpenter's location without probable cause, then it also is a 4th amendment violation to surveil Corridore's whereabouts without probable cause, UNLESS he is considered to be under state custody. In other words, either his location cannot be tracked without probable cause, or he is in custody sufficient to allow the deprivation of the privacy right without probable cause. The only way to avoid the probable cause requirement is if he is in custody by virtue of being deprived of the liberty rights he has under *Carpenter*.

In *Michigan v. Long*, 463 U.S. 1032; 103 S.Ct. 3469; 77 L.Ed.2d 1201 (1983), the Court held that even as small an intrusion as a patdown requires that

there must be "specific and articulable facts which ... reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 480 U.S. at 1049.

Petitioner's person is subject to a lifetime of search. Whether reasonable or not, it is a restraint on his liberty. It would be a legal fiction to say one has his liberty restored when there is a cumbersome box attached to his body for life, which tells every police officer who is interested of his exact whereabouts at all time. It would be a legal fiction to label a lifetime of physical punishment "liberty".

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740 (1984). "Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection." *Payton v. New York*, 445 U.S. 573, 585 (1980). If Petitioner were forced as a result of his conviction to keep that box in his home for a lifetime, that alone would be a restraint on his liberty sufficient to confer Habeas Corpus jurisdiction. Forcing that box to be attached to his leg is a very much greater restraint on his liberty.

In *Spencer v. Kemna*, 523 U.S. 1, 7–8, 118 S. Ct. 978, 983, 140 L. Ed. 2d 43 (1998), the Court held that to maintain a Habeas Corpus action, "The parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis v.*

*Continental Bank Corp.,* 494 U.S. 472, 477–478, 110 S.Ct. 1249, 1254, 108 L.Ed.2d 400 (1990). See also *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975). This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis, supra,* at 477, 110 S.Ct., at 1253."

The Court in *Spencer v. Kemna* also held: "Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some "collateral consequence" of the conviction—must exist if the suit is to be maintained." … " In recent decades, we have been willing to presume that a wrongful criminal conviction has continuing collateral consequences."

The presence of the GPS box on Petitioner's leg, whether justified or not, constitutes "an actual injury traceable to the defendant" which can be "redressed by a favorable judicial decision." This was recognized by the District Court in *Doe v. Barr*, No. 19-CV-4887 (AJN), 2020 WL 4748297, at *4 (S.D.N.Y. Aug. 16, 2020):

> "[T]he Supreme Court has repeatedly held that the in-custody requirement is met where the Government restricts a petitioner's freedom of action or movement. *See, e.g., Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (parolee's challenge to the validity of his conviction can be maintained if a "collateral consequence" of the

conviction still exists).”

In *Lonchar v. Thomas*, 517 U.S. 314; 116 S.Ct. 1293; 134 L.Ed.2d 440 (1996), the Court held that "[d]ismissal of a first federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty."

Certainly, if any judge or their family member were required to wear the same box, even if it did not transmit any information to authorities, they would consider it a severe restraint on their own liberties.  The transmission of data to officials adds to the significance and burden of the restraint.

Probation is sufficient for the custody requirement.  Parole is sufficient for the custody requirement.  To say that reporting to an agent once a month and agreeing not to break laws is more intrusive on liberty than the transmitter on the leg for life would be unreasonable.

This Court should find that requiring Petitioner to wear a box attached to his body for his whole life, while undergoing warrantless transmission of his location information every second, causes Petitioner to suffer a sufficiently severe deprivation of liberty that it constitutes custody for purposes of federal Habeas Corpus.

## II. PETITIONER CORRIDORE WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S MISCONDUCT AND COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THAT MISCONDUCT.

A defendant's due process right to a fair trial is implicated where the prosecutor resorts to improper and unjust methods. U.S. Const. Am XIV; *Donnelly v. DeChristoforo*, 416 U.S. 637, 642; 94 S.Ct. 1868; 40 L.Ed.2d 431 (1974).

### a. The prosecutor engaged in misconduct by vouching for the prosecution witnesses and offering his assessment of Mr. Corridore's guilt.

Determinations of the credibility of witnesses, and of guilt or innocence, are the proper functions of the jury, not the witnesses or the prosecutor acting as if he were a witness. As the Court stated in *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998): "A fundamental premise of our criminal trial system is that the jury is the lie detector." Prosecutors have an independent duty to protect the defendant's right to a fair trial. *Berger v. United States*, 295 U.S. 78, 88; 55 S.Ct. 629, 633; 79 L Ed 1315 (1935).

In *Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005), the prosecutor repeatedly commented on the credibility of witnesses. The prosecutor asserted that the complainant was "absolutely believable" Id. at 377. The Sixth Circuit found

that these statements to the jury, in a case that was a pure credibility contest, were

reversible:

> "As the Supreme Court explained in [*United States v*. *Young*, 470 U.S. 1, 105 SCt 1038, 84 LEd2d 1 (1985)], there are two separate harms that arise from such misconduct. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Young*, 470 U.S. at 18, 105 SCt 1038. Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." Id. at 18-19, 105 SCt 1038. Both concerns are implicated in this case. The prosecutor's numerous statements on witness credibility-often unsupported by any rational justification other than an assumption that [Defendant] was guilty-cannot avoid suggesting to the jury that the prosecutor knows something they do not. Moreover, because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey an impression to the jury that they should simply trust the State's judgment that [the complainant] was a credible witness and that the defendant's witnesses were non-credible, if not perjurious. This misconduct is especially prejudicial in this case given the extent to which the jury's determination as to [Defendant's] guilt or innocence hinged almost entirely on the credibility of [Defendant] and [the complainant]. Id. at 378.

In the instant case the prosecution made the following improper statement during closing argument:

1. "[t]hose are the emails of a guilty man." (TT VIII, 105).

2. "You know very clear on what was said. And again, not something a child would make up." (TT VIII, 88-89).

3. "what this evidence that you've heard shows and proves is that the defendant had been grooming and sexually assaulting MC since she was

very little." (TT VIII, 112). [3]

4. "[MC] has lost all these and this is a child that did nothing wrong. Nothing wrong at all other than tell the truth." (TT VIII, 112).

See *United States v. Lachman*, 48 F.3d 586 (1st Cir. 1995): "The concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt."

In *United States v. Phillips*, 600 F.2d 535, 538-539 (5th Cir. 1979), a witness testified that the defendant in a social security fraud case understood "the meaning of disability" (which would supply the intent element of the fraud charged). The Fifth Circuit Court of Appeals held the opinion testimony was inadmissible under the federal rules of evidence and "'amount[ed] to little more than choosing up sides' on an ultimate issue of fact." It was prejudicial because the jury had to make credibility determinations.

See *Oregon v. Kennedy*, 456 U.S. 667; 102 S.Ct. 2083; 72 L.Ed.2d 416 (1982) [improper for prosecutor to argue that defendant was a "crook" and therefore guilty of the charged crime].

---

[3] The trial court previously ruled that no testimony about grooming would be allowed and the prosecution's expert was prohibited from testifying about any grooming behaviors. (TT VI, 162). The prosecutor dealt with this ruling by making the argument without the supporting testimony.

See also *Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988) [Habeas Corpus relief granted; the Court found that the police officer's "opinion-testimony had a direct influence on the jury's consideration of petitioner's guilt or innocence" and deprived petitioner of his "right to fundamental fairness"]. The constitutional error here is even worse, because it was done by a prosecutor not subject to cross-examination.

In *Ulster County Court v. Allen*, 442 U.S. 140; 99 S.Ct. 2213; 60 L.Ed.2d 777 (1979), the Court held:

> "in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt."

The prosecutor violated his fundamental duties to justice by seeking to persuade the jury to defer to witness evaluations of credibility of the complainant, instead of telling them that they must make the credibility decisions. He violated his duty by presenting the opinion testimony in the first place, even before he relied on them in closing argument to upset the burden of proof.

Because the reasonable doubt standard is the foundation of American Criminal law, it is essential that it be protected to ensure that "the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being convicted". *In re Winship*, 397 U.S. 358; 90 S.Ct. 1068; 25 L.Ed.2d 368 (1970).

26

A conviction should be reversed where prejudicial and improper argument by the prosecutor has the effect of denying the defendant a fair trial. *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987); *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983). The standard is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637; 94 S.Ct. 1868; 40 L.Ed.2d 431 (1974).

### b. The prosecutor engaged in misconduct by encouraging a conviction based on sympathy and a civic duty to protect the community.

Of course, the needs of the community have no bearing on whether one individual, Petitioner Corridore, is guilty of the charged crime or not. It is improper for the prosecutor to seek to convict the accused on the basis of exploiting sympathy or fear. *United States v. Monaghan*, 741 F.2d 1434 (D.C.Cir. 1984); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991); *United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987); *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976); *United States v. DeLoach*, 504 F.2d 185 (DC Cir, 1974); *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir. 1977); *Viereck v. United States*, 318 U.S. 236, 247-48; 63 S.Ct. 561; 87 L.Ed. 734 (1943); *United States v. Monaghan*, 741 F.2d 1434 (D.C.Cir. 1984); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991); *United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987).

A prosecutor may not appeal to the jurors' sympathies for the complainant. See *United States v. DeLoach*, 504 F.2d 185 (D.C. Cir. 1974). As the Court noted in *United States v. Schrock*, 855 F.2d 327 (6th Cir. 1988), quoting from McCormick on Evidence, §185, at 545 (1984): "Prejudice can arise ... from facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence." See also *Shepard v. United States*, 290 U.S. 96; 54 S.Ct. 22; 78 L Ed 196 (1933); *United States v. Merriweather*, 78 F.3d 1070 (6th Cir. 1996).

During closing arguments APA George told the jurors that "the only thing your verdict can do for [MC] is give her some sense that you listened to her and that you believed in her and that you held defendant accountable for what he did to her. That's about the only thing she can get out of this." (TT VIII, 102). APA George also accused the defense of slandering and throwing mud at an innocent little girl. (TT VIII, 157).

The prosecutor, by arguing what the jury can do for the complainant, made an improper appeal to the sympathies of the jury, and their asserted but non-existent duty to avoid doing anything that might upset a complaining witness.

The job of the jury is not to do something for the complaining witness. It was unreasonable to find that prosecutorial argument that the jury's duty was to give comfort to a complaining witness was constitutional. Most people on a jury

28

will want to comfort a child, but the prosecution deliberately and falsely conflated the desire to comfort a child with proof beyond a reasonable doubt that Petitioner is guilty. As the Court noted in *United States v. Schrock*, 855 F.2d 327 (6th Cir. 1988), quoting from McCormick on Evidence, §185, at 545 (1984): "Prejudice can arise ... from facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence."

A civic duty argument, one that asks the jury to convict on improper considerations such as solving the crime problem or protecting children or helping the victim, is improper. *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005).

It was unreasonable to demonize the defense for being the defense. The defense is supposed to find reasons to disbelieve prosecution testimony. The prosecutor is not supposed to argue that the fact of presenting a defense is a reason to convict a defendant. A prosecutor is not permitted to denigrate defense counsel in his remarks before the jury, or use character of the defense counsel as a basis on which to find the defendant guilty. *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1985); *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987). See *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983).

> "Neither is it accurate to state that defense counsel, in general, act in underhanded and unethical ways, and absent specific evidence in the record, no particular defense counsel can be maligned. Even though such prosecutorial expressions of belief are only intended ultimately to impute guilt to the accused, not only are they invalid for that purpose, they also

severe damage an accused's opportunity to present his case before the jury."

The prosecutor improperly denied petitioner a fair trial by diverting the jury's consideration to what the complainant would want and what the community would want, which have no bearing whatsoever on whether the accusations against Petitioner were proven true beyond a reasonable doubt. The prosecutor's argument violated the rule of *Eberhardt v. Bordenkircher*, 605 F.2d 275, 278 (6th Cir. 1979), holding that a prosecutor has a "duty to avoid unfair and misleading argument." Defense counsel improperly denied his client a fair trial by allowing this to take place without objection. *Strickland v. Washington*, 466 U.S. 668, 695-696; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984).

Failure to object to objectionable testimony or argument is often found to be ineffective assistance of counsel in Habeas Corpus cases. *Hodge v. Hurley*, supra; *Lucas v. O'Dea*, 179 F.3d 412 (6th Cir. 1999); *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996).

There was unfair prejudice. See *Old Chief v. United States*, 519 U.S. 172; 117 S.Ct. 644; 136 L.Ed.2d 574 (1997):

> "'Unfair prejudice' … means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

A conviction should be reversed where prejudicial and improper argument by the prosecutor had the effect of denying the defendant a fair trial.

*United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987); *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983). It should not matter what verdict the witness would want, or what verdict might be best for society, or that the prosecutor vouches that witnesses for the prosecution are truthful. The only thing that should matter is whether there are any reasonable doubts as to the defendant's guilt. By diverting the jury from that, the prosecutor denied due process, and by failure to object, defense counsel provided ineffective assistance of counsel. See Issue III for discussion of case law as to this and other instances of ineffective assistance of counsel.

The prejudice is heightened where only one witness testified that Petitioner committed any unlawful touching. Petitioner should have had a trial where he faced the credibility of one witness, not bolstered by several additional witnesses who lacked any knowledge that the witness was truthful, but testified to it anyway.

**III. PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL RESULTING IN ACTUAL PREJUDICE WHERE HIS TRIAL COUNSEL (1) FAILED TO PRESENT TO THE JURY EXPERT TESTIMONY FROM DR. KATHERINE JACOBS THAT WAS SPECIFIC AND RELEVANT TO THE INSTANT CASE; (2) FAILED TO OBJECT TO INADMISSIBLE HEARSAY REPETITION OF MC'S ACCUSATIONS; (3) FAILED TO OBJECT TO CREDIBILITY VOUCHING STATEMENTS AND ELICITED OPINION**

**TESTIMONY ABOUT MC'S CREDIBILITY; (4) FAILED TO OBJECT TO IMPROPER CREDIBILITY VOUCHING TESTIMONY FROM PROSECUTION EXPERT SARAH VISGER KILLIPS; (5) ELICITED INADMISSIBLE EXPERT TESTIMONY FROM A LAY WITNESS.**

A criminal defendant is entitled to the effective assistance of counsel. U.S. Const. Amend. VI, U.S. Const. Amend. XIV; *Strickland v. Washington*, 466 U.S. 668; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984); *Powell v. Alabama*, 287 U.S. 45, 71; 53 S.Ct. 55; 77 L Ed 158 (1932); *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974); U.S. Const. Am VI.

In *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974), the Court stated that, to be constitutionally adequate:

> "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a timely manner."

In *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000), the Court held that "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel".

Defense counsel in a criminal case has a "Duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, supra.

To show prejudice, the defendant must demonstrate a "reasonable

probability" that the result of the proceeding would have been different absent counsel's errors. *Strickland*, 466 U.S. at 694. A defendant need not show that counsel's deficient performance more likely than not altered the outcome in the case. To the contrary, the standard to show prejudice is less than a preponderance of the evidence standard. Id. at 693-694. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland* at 694. Where there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt. *Brown v. Smith*, 551 F.3d 424, 434-435 (6th Cir. 2008), citing Strickland, 466 U.S. at 696.

> a. **Trial Counsel was ineffective for failing to present expert testimony that was readily available and that supported the defense theory.**

The defense presented expert witness testimony from Dr. Katherine Jacobs. Although she did testify, defense counsel failed to elicit the mountain of information she had that would have been favorable to Petitioner Corridore.

On August 9, 2016, defense counsel filed a Second Amended Answer to People's Request for Discovery (now Exh. 5). Attached to the pleading, the defense provided a 17-page report from Dr. Katherine Jacobs in which Dr. Jacobs

identified materials she reviewed, topics about which she would testify, her opinions related to each topic and the underlying basis for each opinion. (See Second Amended Answer, paragraph 3, Exh. 5).

Despite the fact that Dr. Jacobs provided a 17-page report to the defense regarding her professional, expert opinions regarding specific issues in the instant case, the defense failed to elicit Dr. Jacobs' expert opinions as they related to specific facts in the instant case.[4] The unnecessary shortcomings in the presentation of the expert testimony, a result of lack of due diligence by the attorney, were relied upon by the prosecution in closing arguments.

---

[4] Unlike the approach in her written report, Dr. Jacobs had testified in generalities, without being asked by defense counsel to link those generalities to the testimony and circumstances of this case. The generalities had great potential value, but defense counsel did not ask questions for the witness to apply the principles to this case.

Dr. Jacobs testified there is no way to know if a child is telling the truth even if the child submitted to a forensic interview. (TT VI, 217). Dr. Jacobs explained that trained interviewers do not always know or realize when they are asking bad questions of a child. Even when an interview is recorded, trained interviewers make misstatements about whether information came from the interviewer or the child. (TT VI, 218). Dr. Jacobs explained that it is important to record forensic interviews in order to know whether or not a child was led during an interview. (TT VI, 221-222). She also explained that often what a child comes to say often depends on whom a child is speaking to so it is important that a child not be interviewed by a parent or authority figure. (TT VI, 224). Finally, Dr. Jacobs testified that to say something is consistent with something is not very helpful because there could be a million explanations for the behavior apart from the presumption that accusations were true. (TT VI, 240). At no time in her testimony did Dr. Jacobs ever apply these principles to the specifics of the case, because trial counsel did not ask her to.

The prosecution attacked Dr. Jacobs' testimony during his closing argument, (TT VIII, 160).

"[S]he didn't render one opinion to you in this case. What opinion did their witness give you about the facts of this case? She talked about memory and there's the Salem Witch trials and this and that, all these studies -- you know that happened long time ago before the forensic interview protocols. And then she doesn't give you any opinions. Nothing. So I – you know it was a glorified – you know history class if you will."

The prosecution contrasted these shortcomings with the approach he used with his own expert witness, Ms. Killips. APA George argued to the jury, (TT VIII, 160-161):

"Ms. Killips...she did render opinions and she told you that the protocols were followed. That Celina and Marcos' approach in talking to MC was appropriate. That MC's behavior in not disclosing it right away was appropriate. That MC's reaction when talking about the FaceTime call versus sexually assaulted was appropriate. Okay. These were all MC's reactions were all common reactions of a sexually abused child. So the People's expert gave you very specific opinions in support of MC. Okay. So if you're going to think about the experts or talk about the experts think of it that way and ask yourself what opinion did she give you, zero."

Regrettably, the criticism by APA George of trial counsel's performance in the presentation had merit. Trial counsel failed to elicit the relevant expert testimony from Dr. Jacobs, despite the fact that her 17-page report (Exh. 5) contained specific expert opinions about the instant allegations. Because of trial

counsel's failure Dr. Jacobs was never given an opportunity to address many allegations made by the prosecution's expert. Specifically, Dr. Jacobs' report addressed the following that the jury never heard:

1. The misconception that suggestibility is primarily a problem for preschoolers, and is not a problem with older children, like MC. (See pp. 4, 6 of Dr. Jacobs' report, Exh. 5, pp. 8, 10).

2. The need to follow proper forensic protocols and the risks inherent in failure to follow the proper protocols. (See pp. 7-9 of Dr. Jacobs' report, Exh. 5, pp. 11-13). [5]

3. The possibility of taint to a properly conducting forensic interview, including criticism of the interview and questioning conducted by Celina and Marco Corridore. (See pp. 10-12 of Dr. Jacobs' report, Exh. 5, pp. 14-16).

4. The unreliability of Celina and Marco's memory of their interview of MC and the research that indicates that interviewers are notoriously bad historians of their own interviews. (See pp. 13-15 of Dr. Jacobs' report, Exh. 5, pp. 17-19).

5. Research that indicates that the pattern of disclosure (accusation) in the instant case is inconsistent with research. (See pp. 16-17 of Dr. Jacobs' report, Exh. 5, pp. 20-21).

Additionally, on March 5, 2017, prior to the second trial, Dr. Jacobs sent a several page email to trial counsel in which she dissected Ms. Killips' prior

---

[5] Many of the same concerns and violations of the forensic interview protocol that applied to Celina and Dr. Marco Corridore's interview of MC, would also apply to the interview Detective O'Dea conducted.

testimony for trial counsel. Dr. Jacobs also provided a number of concerns that she had for trial counsel and his failure to elicit favorable testimony for the defense, along with suggestions as to how his direct and cross could be more persuasive for the second trial. (Appendix C). Trial counsel ignored the vast majority of Dr. Jacobs' concerns, including highlighting the difference in training between the two experts, preventing testimony about grooming, preventing improper bolstering testimony from Killips and challenging her failure to identify studies that support her assertions. She also admonished trial counsel for failing to elicit testimony from Dr. Jacobs about Celina Corridore's interview of the child, why it was improper to assume Celina's recollection of the interview was reliable and other issues related to improper questioning of MC.

It could not be strategic to ignore (or fail to read in the first place— without the evidentiary hearing requested in state court we do not know which of them occurred) the guidance of his own expert witness, especially where no good reason for avoiding linking general principles to the facts and circumstances existed. Counsel has a constitutional duty to "subject the prosecution's case to meaningful adversarial testing" whenever his client pleads not guilty. *United States v. Cronic*, 466 U.S. 648, 659; 104 S.Ct. 2039; 80 L.Ed.2d 657 (1984).

Trial counsel had a plethora of information at his disposal, well in advance of trial, and he failed to elicit expert testimony from Dr. Jacobs that would

allow the jury to evaluate the reliability of MC's testimony and out of court statements, despite clear warnings from Dr. Jacobs. The prosecution correctly criticized the shortcomings in trial counsel's approach to the expert testimony. Dr. Jacobs came into the courtroom and failed to provide the jury with a single relevant or helpful opinion linked to the circumstances of this case, because trial counsel failed to do his job, despite the fact that his expert armed him with a multitude of weapons. It is not enough to consult with an expert; counsel must understand the testimony that the expert has to offer and know how to elicit and present all of the favorable testimony from the expert that is available.

There was no strategic reason for trial counsel's failure to attack the reliability of Celina Corridore's interview of MC, failure to attack the reliability of MC's accusation, or failure to attack the testimony of the prosecution's expert. Trial counsel's failures prejudiced Mr. Corridore's trial, where the prosecution's expert went unchallenged despite ample testimony available to challenge her assertions.

In *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000), the Court held that "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel".

In its ruling, the Court of Appeals observed that "[A]lthough Dr. Jacobs provided comprehensive testimony regarding the risk that a parent or police officer

will influence the disclosures a child will make in a forensic interview, she did not offer testimony applying this information to reach a conclusion about the events in this case." (Opinion, 3, Exh. 3) In other words, the Michigan Court of Appeals found the same shortcomings in defense counsel's performance as Petitioner alleges.

In its ruling, the Court of Appeals also observed (Opinion, 6, Exh. 3):

"Dr. Jacobs' testimony enabled defense counsel to apply the other witnesses' testimony to the facts and circumstances of the case to offer a comprehensive explanation for why the victim's disclosures should be deemed unreliable. In hindsight, this strategy might have been more persuasive if defense counsel had challenged Dr. Jacobs about her conclusions regarding the victim's disclosures, in addition to laying the groundwork for the jury to draw these conclusions for itself, but this does not establish that counsel was ineffective. "

Petitioner respectfully submits the Court's opinion unreasonably applied the law, and hindsight has nothing to do with it. It is not hindsight to expect defense counsel to read the witness reports and to be guided at least in part by those reports in framing appropriate questions. Well before trial, counsel was provided with pages of material for counsel's review, (all of the documents were provided to the trial court and higher state courts). Dr. Jacobs provided to counsel a roadmap for effective use of her testimony and expertise. Hindsight was not required to properly and effectively use the expert testimony.

Trial counsel ignored the questioning that was prepared for him and

instead followed the easy path of eliciting general principles from Dr. Jacobs, a path that could have been followed without even reading the Jacobs reports. Counsel failed to ask any questions that applied those principles to the facts of Mr. Corridore's case, thus reducing a powerful defense to a weak, barely supported defense. It is hard to see any basis for any reasonable attorney to believe this approach would help Petitioner. Under the circumstances of this case, "Counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992).

Furthermore, the Court of Appeals analysis is flawed in that it conflates witness testimony with closing argument. It excuses trial counsel's conduct by finding that trial counsel's approach allowed counsel "to apply the other witnesses' testimony to the facts and circumstances of the case to offer a comprehensive explanation for why the victim's disclosures should be deemed unreliable," but this explanation would have to come during closing arguments which are not evidence, and the jury is explicitly instructed that closing arguments are not evidence. See M Crim JI 2.03 and 3.05. Furthermore, jurors are presumed to follow the instructions provided to them. *People v. Abraham*, 256 Mich. App. 265, 279; 662 N.W.2d 836 (2003). Waiting until closing argument to make the connection of Dr. Jacobs' testimony to the relevant facts of the case (which is what the Court of Appeals declared to be trial strategy) would be close to pointless where it was not supported

by expert witness testimony, because counsel did not ask the questions during the evidentiary portion of the case to elicit such testimony. If trial counsel had done as the Court of Appeals suggested (without evidence), that surely would have been ineffective assistance of counsel where counsel had available pages upon pages of specific information from Dr. Jacobs prior to trial, but failed to elicit that testimony. This resulted in the jury placing reliance and credence upon the only expert testimony linked to the facts of this case: the prosecution's expert.

The Court of Appeals accurately criticized her testimony for lack of specificity to any of the facts and circumstances of the case, but unreasonably laid that at the door of the witness, instead of at the door of the attorney who failed to ask the proper questions.

The Court of Appeals ruling was unreasonable because it did not conform to federal case law, and did not even conform to state case law precedent. In *People v. Armstrong*, 490 Mich. 281; 806 N.W.2d 676 (2011), the Michigan Supreme Court reversed the defendant's conviction, finding his trial counsel was ineffective for failing to introduce cell phone records at trial that would have impeached the complainant's testimony. At Armstrong's trial attacking the complainant's credibility became central to the defense's case. Id. at 286. During trial the complainant testified that she never communicated with Armstrong after the second rape, but she acknowledged that Armstrong tried to communicate with

her. Id. at 286-287. Defense counsel tried to introduce cell phone records that proved the complainant placed hundreds of calls to Armstrong following the second alleged rape. However, the prosecution objected for lack of foundation and the court sustained the objection. Defense counsel then abandoned any attempt to have the records admitted. Id. at 287.

In *Armstrong*, the trial court found that trial counsel's conduct fell below an objective standard of reasonableness but that Armstrong was not prejudiced. The Court of Appeals agreed. The Supreme Court reversed, finding that the defendant was prejudiced. The court noted, "[A]ny attorney acting reasonably would have moved for the records' admission, particularly when, as here, attacking the complainant's credibility offered the most promising defense strategy." Id. at 290-291. The Supreme Court found that the Court of Appeals erroneously found that Armstrong was not prejudiced because the complainant's credibility had been thoroughly impeached by other means. The Supreme Court observed, 490 Mich. at 291:

> "The defense's whole theory of the case was that the complainant had falsely accused defendant of rape. The attacks on the complainant's credibility at trial were inconclusive, providing mere "he said, she said" testimony contradicting the complainant's version of the events. The other credibility attacks revealed that the complainant had falsely accused her stepfather of a rape on a prior occasion and that she habitually lied. Although unquestionably significant, such attacks had less of a tendency to undermine the complainant's credibility than the cell phone records, which would have provided documentary proof strongly suggesting that the complainant lied to this jury regarding her actions in connection with

the alleged rapes in this case."

The court recognized that the records provided "powerful evidence of the complainant's lying to the jury in a case that essentially boiled down to whether the complainant's allegations of rape were true." Id at 293. The Michigan Supreme Court commented that "given the telephone records' significance, a reasonable probability exists that this additional attack on the complainant's credibility would have tipped the scales in favor of finding a reasonable doubt about defendant's guilt." Id. at 291.

Failure of defense counsel to adequately present a defense constitutes ineffective assistance of counsel. *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992); *Landers v. Rees*, 782 F.2d 1042 (6th Cir. 1985); *Wilson v. Cowan*, 578 F.2d 166 (6th Cir. 1978); *Beasley v. United States*, supra; *United States v. Porterfield*, 624 F.2d 122 (10th Cir. 1980); *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978); *Sullivan v. Fairman*, 819 F.2d 1382, 1391-1392 (7th Cir. 1987).

As the Court held in *Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999):

> "A lawyer who fails adequately to investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

Trial counsel's conduct in the instant matter is analogous to the conduct

of counsel in *Armstrong* and *Hart*. He had tools to bolster his defense theory, to impeach the prosecution's expert witness and to question the reliability of MC's out of court statements and allegations, yet he used none of them. The prosecution admonished the defense expert for failing to provide a single opinion to the jury related to the case, and the prosecution was right, but it was not because the expert failed to provide the information to counsel before trial, **it was because counsel failed to prepare himself before trial**.[6]

Here, as in *Lord v. Wood*, 184 F.3d 1097 (9th Cir. 1999), "trial counsel had at their fingertips information that could have undermined the prosecution's case, yet chose not to develop this evidence…Their performance therefore fell outside the wide range of professionally competent assistance that *Strickland* requires."

M.C.R. 6.201 provides in relevant part:

"(A) Mandatory Disclosure. In addition to disclosures required by provisions of law other than M.C.L. 767.94a, a party upon request must provide all other parties:***
(3) the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the

---

[6]     It appears that trial counsel failed to secure a report from Killips prior to her testimony in the second trial. She was not required to provide one prior to the first trial because the prosecution called her as a rebuttal witness. However, she was called in the prosecution's case in chief at the second trial. There is no evidence that the prosecution provided a report in compliance with M.C.R. 6.201(A)(3), or that the defense requested one. (The evidentiary hearing requested but denied in state court would have established this with certainty. See Issue IV).

proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion"

While the prior versions of the rule made the preparation of an expert's report a matter of discretion, the amended rule is not so forgiving. The amendment recognizes the necessity of providing each party appropriate notice of the expected testimony. This is a basic legal concept of fairness and due process. See *Dennis v. United States*, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1965):

> The legal concept of a criminal trial has changed considerably in modern times. It is seen less as an arena where two lawyer gladiators duel with the accused's fate hanging on the outcome and more as an inquiry primarily directed toward the fair ascertainment of truth. The purpose of broad discovery is to promote the fullest possible presentation of the facts, minimize opportunities for falsification of evidence, and eliminate the vestiges of trial by combat. *State v. Tune*, 13 N.J. 203, 210, 98 A.2d 881, 884. These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice..

Having an absolute legal right to such discovery, trial counsel slipped again by not even requesting it. By not requesting a report in conformity with M.C.R. 6.201, defense counsel was ill prepared for Killips' testimony. Even though she testified at the first trial, her testimony at the second trial did not mimic her testimony at the second trial. A report would have put counsel on notice as to the additions or modifications in her testimony. It would have also provided Dr. Jacobs additional opportunity to provide counsel with ammunition to impeach Dr. Killips.

The trial court disposed of all of Mr. Corridore's claims of ineffective assistance of counsel with the following language (trial court opinion, 2, Exh. 1):

> The court finds that Defendant has not met the burden of overcoming the strong presumption that trial counsel acted effectively. Defense counsel's trial strategy should not be second guessed and defense counsel's actions did not fall below an objective standard of reasonableness. Defendant cannot show that but for the alleged errors, a reasonable probability existed that the outcome of the proceedings would have been different. Because the existing record demonstrates a rational basis for counsel's actions, the claim of ineffective assistance fails and a *Ginther* hearing is unnecessary.

In *Washington v. Hofbauer*, supra, the Court held that "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel". As the Court held in *Daly v. Burt*, No. 05-40186 (E.D. Mich. 3-25-2009) [Opinion of Judge Steven Murphy], regarding an attorney's failure to object to evidence introduced by the prosecution: "The purposeful introduction of the extremely damaging proofs … cannot be considered sound trial strategy."

The trial court unreasonably failed to address the individual claims of ineffective assistance of counsel or explain how trial counsel's failure to introduce expert testimony that was readily available to it did not amount to ineffective assistance of counsel or how it could be considered reasonable trial strategy to gather the evidence from the expert and then fail to present to the jury and use it to challenge the prosecution's own expert.

Instead, the trial court implicitly adopted the approach that every accusation against a defendant, particularly when made by a child, is *ipso facto* correct and will be believed, that therefore attacks on such accusations are automatically doomed to fail, therefore it is impossible for defense counsel to have committed ineffective assistance of counsel. Adopting this approach was unreasonable.

Defense counsel's unreasonable actions and failures to act could cause the jury to abandon the presumption of innocence and vote for conviction. *Taylor v. Kentucky*, 436 U.S. 478; 98 S.Ct. 1930; 56 L.Ed.2d 468 (1978). The prejudice is heightened where only one witness testified that Petitioner committed any unlawful touching.

### b. Trial Counsel was ineffective for failing to object to inadmissible hearsay testimony recounting out of court statements of MC.

During trial, Celina and Marco Corridore were allowed to testify about MC's out of court statements, amounting to accusations, and were allowed to repeat their recollections of the questions they asked her and her responses to them, word for word. During Celina Corridore's testimony, APA George asked her to repeat out of court conversations, notably with MC on January 27, 2016. Defense counsel objected and the objection was initially sustained. (TT III, 75-76), but the effectiveness ended right there. Only moments later Celina began to again repeat

the conversation but defense counsel did not object on hearsay grounds. (TT III, 77). Celina continued to testify about her questions to MC without objection. (TT III, 78). Though the testimony violated the rules of evidence about hearsay, M.R.E. 801, 802, defense counsel could not be troubled to continue to object. He was asleep at the switch while the prosecutor's train was running over Petitioner, unobstructed.

Celina continued to retell her entire conversation with MC, including all of her questions and all of MC's statements (disclosures). [7] (TT III, 83-85, 87, 89). Defense counsel did not renew his objection. After several pages of Celina retelling MC's statements in great detail, [8] defense counsel then asked if the prosecution was seeking to admit the testimony under the present sense impression exception or the excited utterance exception to the hearsay rule. (TT III, 89). In other words, any objection was too late, barely qualified as an objection, and

---

[7] The term "disclosed" or "disclosure" suggests the revelation of something that is true. Even though the prosecutor and prosecution witness used this term (without objection), it is inappropriate as the correct term would be "said" or "accused" which apply whether the things said were true or not. It was a serious shortcoming for defense counsel to fail to demonstrate to the jury the hidden presumptions implied by using the term "disclosed," but that is not a preserved legal issue.

[8] Interestingly, during Mr. Corridore's first trial, APA George warned Celina that she could not testify to what MC said during their conversation. (See First Trial, Volume 2 at pgs. 44-46). It was ineffective assistance of counsel for defense counsel to fail to promote the position that the prosecutor promoted at the first trial, where that objection could have prevented the elicitation of inadmissible testimony making stronger the case against Petitioner.

suggested to the prosecutor explanations for the hearsay violations, explanations that do not apply.[9]  Defense counsel should have been challenging the prosecutor's violation of the rules of evidence, instead of providing a basis for the objection to lose.

Trial Counsel was ineffective for failing to properly argue and object to the admissibility of the testimony as excited utterances or present sense impressions, and the trial court erred in admitting the testimony under those explanations.  Not only do both the court rule and case law establish that the statements do not qualify as excited utterances, but there was ample testimony from the first trial to establish that MC was not under continued stress or

---

[9] The events allegedly were at Christmas 2015, but were not the subject of a conversation until a month later on January 27, 2016.  That could not possibly be either a present sense impression or an excited utterance.

excitement from the startling event. [10]

The Court of Appeals panel agreed that Celina's testimony regarding the MC's out of court statements was not properly admitted as an excited utterance. (Opinion, 8, Exh. 3). The Court of Appeals determined that the error did not amount to ineffective assistance of counsel because "the record indicates that defense counsel's decisions not to object and to affirmatively inquire into the victim's statements to the victim's mother, father and Detective O'Dea were part of a reasonable strategy of persuading the jury that the victim's trial testimony was not credible or unreliable because her disclosures were developed and influenced by these witnesses." Id. at 10.

---

[10] An excited utterance is defined as: "[A] statement relating to a starling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). Justification for this rule "lies in the belief that 'special reliability' can be afforded a statement made while under sufficient stress or excitement because 'the declarant's powers of reflection and fabrication' are removed." *People v. Straight*, 430 Mich. 418; 424 N.W.2d 257 (1988), citing McCormick, Evidence (3d ed), §297, p 855. *Straight* also holds: "Evidence that the statement was self-serving or **made in response to an inquiry**, while not justification for automatic exclusion, is an indication that the statement was the result of reflective thought, and whether the time interval permitted such thought these factors might swing the balance in favor of exclusion. See *Ykimoff v. Foote Mem. Hosp.*, 285 Mich. App. 80, 106, 776 N.W.2d 114, 130 (2009): "the comments made on the day following the second surgery are clearly precluded because of the failure to establish temporal proximity with the alleged events." See also *People v. Gee*, 406 Mich. 279, 282; 278 N.W.2d 304 (1979), where the Court summarized the criteria for an excited utterance as follows: "(1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion."

What the Court of Appeals unreasonably overlooked is that "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel", *Washington v. Hofbauer*, supra. MC's answers to various people's questions in the past, do not in any way advance the defense theory, if the statements were consistent. If counsel had read the discovery he would have known that they were consistent. What was important to the defense case was that MC was repeatedly spoken to, including questioning, by various people including her parents and the Detective, over a month after the alleged events, making the out of court statements neither an excited utterance nor present sense impression. Repetition of her alleged out of court statements responding to or agreeing with her questioners did not advance the defense theory. The defense theory would have been advanced by objections to exclude testimony harmful to the defense that was not arguably admissible under any theory (The Court of Appeals admitted it was not admissible, Opinion, 10, Exh. 3).

In the instant case the testimony provided by Celina and Marco Corridore, in which they provided a detailed retelling of MC's out of court statements of (1) the FaceTime allegation, (2) the underlying allegation of Mr. Corridore placing his hand down MC's pants and (3) various other bad acts, was inadmissible hearsay and did not qualify as excited utterances. Celina Corridore's own testimony from the first trial was that when she returned home on the night of

the sleepover (the same night as the FaceTime event), she checked in on the girls and nothing seemed out of sorts. She asked the girls if they needed anything, they told her "no," and that they were "great." Celina told them they should probably get ready for bed. (See First Trial, TT II, 19). Celina also testified during the first trial that everything seemed normal with MC after Christmas and throughout all of January. (See First Trial, TT II, 15-16). Celina provided no testimony that on the night of the alleged FaceTime event that MC seemed under stress or emotional. There was no testimony provided by either parent that during the days between the alleged FaceTime event and the accusations that MC was emotional, crying or under stress. Marco Corridore's testimony from the first trial repeatedly asserted that MC was calm and matter of fact when she made the allegations of touching and he testified as to how remarkable the change in her demeanor was when MC allegedly spoke of the FaceTime event versus the touching. (See First Trial, TT IV, 121-122, 154, 157, 170). Trial Counsel failed to bring Marco Corridore's testimony to the attention of the court, which was crucial to the analysis of the admissibility of the testimony. The case law does not allow for the admissibility of MC's statements through her parents. *People v. Straight*, supra, so failure to object was a serious mistake of counsel.

In *People v. Straight*, the defendant was charged with criminal sexual conduct. He challenged the admissibility of the complainant's statements, made

approximately one month after the event, as related by her parents, under the excited utterance exception to the hearsay rule. *Straight*, 430 Mich. at 419-420. The Michigan Supreme Court found that the statements were not admissible and that the use of the statements required that the case be remanded for a new trial.

Here, as in *Straight*, the child initially did not disclose any abuse, but upon repeated questioning, the child ultimately stated there was sexual abuse at the hands of the neighbor. Her "disclosure" (out of court accusation) was retold at the trial through her parents' testimony. Id. at 421. This required reversal.

The Court of Appeals determined that counsel's error did not amount to ineffective assistance of counsel because "the record indicates that defense counsel's decisions not to object and to affirmatively inquire into the victim's statements to the victim's mother, father and Detective O'Dea were part of a reasonable strategy of persuading the jury that the victim's trial testimony was not credible or unreliable because her disclosures were developed and influenced by these witnesses." Id. at 10. What the Court of Appeals unreasonable failed to consider is that MC's responses to various people's questions or suggestions do not advance the defense theory of the case. What was important to the defense theory was that MC was repeatedly questioned by various people including her parents and the Detective a month after the date of alleged events. The defense did not need her out of court statements consistent with the testimony that defense counsel

was supposed to be challenging.

Admissibility of MC's statement through her parents is also improper under *People v. Douglas*, 496 Mich. 557; 852 N.W.2d 587 (2014), therefore, failure to challenge was again ineffective assistance of counsel. In *Douglas*, the defendant's conviction was reversed because the Supreme Court concluded that "[U]nder these circumstances, it simply cannot be concluded that the statements were made 'while the declarant was under the stress of excitement caused by the event or condition.'" Once again, counsel's failure to act was unreasonable.

In the instant case, there was no evidence that after the supposed Christmas events MC could not function, that she did not go to school, or that she was upset and crying during those days. All evidence was to the contrary. Furthermore, Marco Corridore's testimony was that MC was calm and matter of fact when she announced the allegations of touching and that she was not upset or crying. Finally, there was a total of approximately 35-37 days between the alleged date of touching and the first allegation. That amount of time precludes the admission of Celina and Marco's testimony of MC's out of court statements.

There were three and a half days between the alleged FaceTime incident and MC's accusation. That passage of time also precluded admission of the testimony. Trial counsel was ineffective for failing to object to the testimony and once he did object, he was ineffective for withdrawing his objection, for failing to

argue the applicable court rule and case law and for failing to present prior testimony from Celina and Marco Corridore that blatantly contradicted the claim that MC remained emotionally distraught throughout her original accusation and that she remained under the stress of the event for over 30 days.

In the instant case, MC's allegations were repeated via multiple people/sources. Her allegations were improperly admitted through Celina, Marco, and Detective O'Dea.[11] All of this testimony was improper hearsay that defense counsel failed to object to or elicited himself. Just as in *Douglas*, the retelling of MC's allegations over and over, tipped the scales in a case that was a pure credibility contest, where there were no independent third-party witnesses, and no corroborating physical evidence.

The trial court addressed all claims of ineffective assistance of counsel with one paragraph and did not explain how trial counsel's strategy could have been strategic where the repeated admission of inadmissible hearsay only served to vouch for the complainant and bolster her allegations. The trial court did not explain whether the statements were admissible as excited utterances and if they were not, then how trial counsel could be considered effective when he failed to argue the relevant law regarding excited utterances. The trial court did not explain

---

[11] Detective O'Dea was able to retell MC's allegations during cross-examination. Counsel was ineffective for eliciting this testimony from O'Dea. (TT IV, 117-118).

how the repeated retelling of MC's out of court statements did not violate *Douglas* and *Straight*, nor did the trial court explain how the failure to object to the inadmissible testimony could be considered reasonable trial strategy. The "strategy" of allowing prejudicial inadmissible testimony against ones own client is no strategy at all, but is an abandonment of the duty to the client. To call this strategy is unreasonable.

Allowing prejudicial information to come before the jury that could have been excluded is ineffective assistance of counsel. *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997); *Ward v. United States*, 995 F.2d 1317 (6th Cir. 1993). Allowing damaging information to be admitted without objection, where the evidence could have been excluded, is ineffective assistance of counsel. See *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) [counsel ineffective where his failure to call a medical expert was based on an insufficient investigation]

The case law and rules of evidence mandate a finding that in a credibility contest such as the instant case, there can be no strategic reason for trial counsel's abject failure to prevent inadmissible credibility vouching and bolstering testimony during trial.

    **c. Trial counsel was ineffective for failing to object to credibility vouching testimony and for eliciting credibility opinion and vouching statements from various witnesses. Counsel was also ineffective for eliciting opinion testimony regarding the credibility of the**

**complainant.**

The Due Process Clause of U.S. Const. Am XIV prohibits introduction of opinion testimony as to a defendant's guilt. *Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988). Under Michigan law determining witness credibility and the guilt or innocence of the accused are functions that lie solely within the province of the jury and nothing should interfere with its ability to perform those functions. *People v. Clark*, 340 Mich. 411; 65 N.W.2d 717 (1954); *People v. Montgomery*, 22 Mich. App. 87; 176 N.W.2d 697 (1970). It is thus improper for a prosecution witness to express an opinion on the defendant's guilt. *People v. Smith*, 158 Mich. App. 220, 230-31; 405 N.W.2d 156 (1987); *People v. Peterson*, 450 Mich. 349, 352; 537 N.W.2d 857 (1995); *People v. Humphreys*, 24 Mich. App. 411, 418-420; 180 N.W.2d 328 (1970). As the Court stated in *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998): "A fundamental premise of our criminal trial system is that the jury is the lie detector."

In *People v. Musser*, 494 Mich. 337, 835 N.W.2d 319 (2013), the Michigan Supreme Court recognized the dangers of credibility vouching testimony. In *Musser* the court reversed for the admission of credibility vouching statements made by a detective during an interview of the defendant. However, Musser's defense counsel, unlike counsel for Petitioner, actually objected. See also *People v. Dobek*, 274 Mich. App. 58, 71 (2007):

"It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury. *People v. Buckey*, 424 Mich. 1, 17; 378 N.W.2d 432 (1985); *People v. Smith*, 158 Mich. App. 220, 230-231; 405 N.W.2d 156(1987)."

The same approach applies under federal law: "[i]t is 'the Anglo-Saxon tradition of criminal justice...[that] makes jurors the judges of the credibility of testimony offered by witnesses.'" *United States v. Bailey*, 444 U.S. 394, 414; 100 S.Ct. 624; 62 L.Ed.2d 575 (1980). It is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. Testimony of this kind invades the factfinding functions of the jury and denies a fair trial. *United States v. Harber*, 53 F.3d 236 (9th Cir. 1995); *United States v. Scop*, 846 F.2d 135, 142 (2nd. Cir. 1988); *People v. Buckey*, 424 Mich. 1, 17; 378 N.W.2d 432 (1985).

Such statements have no probative value because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v. Taft*, 306 Conn 749, 764; 51 A3d 988 (2012). The jury is to evaluate the truthfulness of witnesses, without the opinions of experts to lead them to believe or disbelieve a witness.

Throughout the trial the prosecution elicited credibility vouching statements that trial counsel failed to object to, and trial counsel himself elicited

catastrophic credibility vouching statements.[12] Counsel was ineffective both for failing to object to the statements elicited by the prosecution and for asking questions that he should have known would result in credibility vouching statements from various witnesses. Although it would be close to impossible to list all of the instances in which this happened the following is a sampling:

1. Celina Corridore testified on direct examination that after looking at MC's text messages she "thought something happened." She reiterated that after looking at the texts, "clearly something happened." (TT III, 66, 68).

2. During Celina Corridore's testimony she testified that MC "disclosed" the same story that she had already heard from Beth. (TT III, 84-85).

3. Celina again testified that what MC told her confirmed exactly what she was told earlier. (TT III, 85).

4. Defense counsel referenced inadmissible hearsay when cross-examining Celina and asked Celina, "You said to her [Mary Corridore] that there's no possible way MC could have orchestrated all this herself." (TT III, 137). Defense counsel then asked Celina, "why not?" to which Celina responded, "MC is not capable of making something like this up." (TT III, 137).

5. Defense counsel asked Celina what she thought when she became aware that Mr. Corridore told Marco about Mr. Corridore's claim that he saw SV's head in between MC's legs. Her response, "my first thought was you would have to be a pedophile to even imagine something like that and he must be sicker than we even assumed." (TT III, 139).

6. Defense counsel elicited testimony from Celina that Detective O'Dea told her that in his opinion, MC was credible. (TT III, 151).

7. On direct examination Detective O'Dea testified that if he thinks there is

---

[12] Trial counsel's errors were compounded because when he elicited damaging and improper credibility vouching testimony he never asked the trial court to strike the testimony.

enough probable cause in a case he submits it to the prosecutor's office for charges. (TT IV, 6). He further explained that he is assigned cases by his commanding officer. If the officer reviews the report and thinks it needs follow up and it's a strong case, it will be forwarded to him. (TT IV, 7). His job is to discover the truth. (TT IV, 7). The detective again reiterated that his job is to discover the truth. (TT IV, 10).[12]

8.   Defense counsel, during cross examination of Detective O'Dea, elicited testimony from O'Dea in which O'Dea retold three statements that MC made to him when he interviewed her. (TT IV, 117-118).

9.   Defense counsel elicited testimony from Detective O'Dea that he told Celina how powerful MC's disclosure was. (TT IV, 125).

10.   Defense counsel asked Detective O'Dea whether he knew MC was telling the truth, to which the detective responded, "I believe MC's telling the truth." Defense counsel then challenged him again and said, "I didn't ask you what you believe. Do you know?" The detective responded, "I know she's telling the truth." Defense counsel asked, "And how do you know that?" The detective responded, "[B]ecasue I have -- I have several facts in evidence." He then proceeded to list all of the evidence that leads him to know that MC is telling the truth. (TT IV, 132-133).

11.   Defense counsel elicited testimony from the detective that MC's allegations were the same to Shane, Cathy Davis, her mother, her father and to the detective. (TT IV, 138).

12.   Defense counsel again elicited testimony from Detective O'Dea that he knew MC's allegations to be true. (TT IV, 140).

13.   Defense counsel again engaged Detective O'Dea in argument about whether or not he knew MC was telling the truth which resulted in O'Dea testifying three more times that he knew MC was telling the truth. (TT IV, 172-173).

14.   During cross examination of Marco Corridore, defense counsel asked Marco whether he believed MC at the time of her accusation. This elicited a response of "yes." (TT V, 248).

15.   During cross examination of Marco Corridore defense counsel asked the witness if he knew MC's claims to be true, to which the witness responded, "I trust my daughter." (TT VI, 31).

16. Defense counsel asked Marco Corridore if it ever occurred to him that his father might not be guilty? Marco responded, "[N]o, because the sincerity...and innocence that my daughter talked to U.S. and the fact that I had numerous people who are trained to deal with this--." (TT VI, 67)

17. At the conclusion of Marco Corridore's testimony the jurors submitted questions to the Court for the witness. Without objection from defense counsel, the court was allowed to ask Marco Corridore the following: "What were your thoughts when your father decided to stay [in Mexico]?" This question was not only wholly irrelevant but there was no doubt that it would elicit improper testimony. Marco Corridore responded, "[S]o my thoughts at that point were that, that he was guilty. That he wasn't acting in the way I would think an innocent person would act. An innocent person would have immediately gone, dealt with that situation, talked to whomever they had to talk to. Would have spoken to my mother immediately. I can't imagine—" (TT VI, 105). Trial counsel then asked for permission to object and the court told him he had an opportunity to object to the question before it was asked, but failed to do so. (TT VI, 105-106).

18. Testimony that was offered from both Celina and Marco Corridore and from Sarah Killips that MC was desensitized and normalized to the abuse was improper credibility vouching. The testimony amounted to the witnesses offering improper psychological testimony and vouching that MC must have been a victim for an extended period of time so that she did not experience an emotional reaction to the abuse as compared to the FaceTime event which was a "new" event/allegation. (TT V, 254, 261) (TT VI, 171-172, 173, 176).

Detective O'Dea's statements are analogous to the erroneously admitted CPS worker's testimony in *Douglas*, supra. In *Douglas*, the CPS worker testified that if she thought a child was lying about sexual abuse, she would not seek such a petition. *Douglas*, 496 Mich. at 570.

The Court of Appeals rejected this argument finding that trial counsel

either elicited credibility vouching statements himself (which could not reasonably deflect a claim of ineffective assistance of counsel) or failed to object to the statements because it was part of his trial strategy to show that Detective O'Dea and MC's parents blindly believed MC without engaging in further investigation.

That the parents believed MC is not relevant evidence, but is prejudicial in that it adds a non-probative basis to believe the witness. That investigators believed MC also is not relevant evidence, but is prejudicial in that it adds a non-probative basis to believe the witness. It was ineffective for counsel to failure to object to such testimony presented by the prosecutor, and ineffective for counsel to actually present some such testimony himself. How can it possibly be strategy to add to the testimony against one's own client instead of seeking to exclude it, where the objection would have been supported by state and federal case law?

The Court of Appeals excused trial counsel's repeated efforts to elicit testimony from the Detective that he believed MC in order to explain why he failed to complete a thorough investigation. The Court of Appeals again acted unreasonably. Trial counsel reasonably wanted to make the point that the Detective failed to engage in a thorough investigation, he failed to interview all relevant witnesses, and he failed to consider other hypothesis. The fact that he failed to do those things because he wholeheartedly believed MC's accusation is inadmissible and should have never been admitted.

The Court of Appeals acknowledged that this case was a credibility contest. If proper procedures had been followed it would have been one witness against one, instead of Petitioner being met not only with one witness with personal knowledge, but with three extra witnesses who, with no personal knowledge, declared the testimony of MC to be true. This improper opinion and vouching testimony absolutely prejudiced Petitioner Corridore, and his counsel was ineffective for failing to appreciate the inadmissibility of the testimony and catastrophic nature of the testimony.

Petitioner's trial was replete with improper vouching and bolstering testimony both at the hands of the prosecution and at the inept hands of trial counsel who repeatedly elicited testimony that MC was truthful, that she could not manufacture the allegations, and that Petitioner Corridore was guilty and "acted like" a guilty man. In a case that was a pure credibility contest this type of testimony was highly likely to tip the scales in favor of the prosecution, which it did.

**d. Trial Counsel was ineffective for failing to object to the expert testimony of Sarah Visger Killips, who testified outside her area of expertise and who offered credibility vouching testimony.**

Because the testimony was inadmissible under state law, and was prejudicial to petitioner, it was ineffective assistance of counsel to fail to object.

*Strickland v. Washington*, supra.

In *People v. Peterson*, 450 Mich. 349; 537 N.W.2d 857 (1995), the Supreme Court reaffirmed its holdings in *People v. Beckley*, 434 Mich. 691; 456 N.W.2d 391 (1990), that (1) an expert cannot testify that the sexual abuse occurred, (2) an expert cannot vouch for the victim's credibility and (3) the expert cannot testify that the defendant is guilty. As the Court held in *Peterson*: "Such testimony would be improper because it comes too close to testifying that the particular child is a victim of sexual abuse." Id. at 373-374.

In *Peterson*, the Court concluded that admission of the experts' testimony was improper. The expert's references to truthfulness on the part of child victims went beyond that permitted by M.R.E. 702. Id. at 376. Most relevant herein, the *Peterson* Court held that the experts had been improperly allowed to reference consistencies between the victim's behavior and the behavior of typical victims of child sexual abuse where the defendant never challenged that the behavior was inconsistent with that of an actual victim of child abuse. The admission of such testimony was error where the defendant never argued that the victim's behavior was inconsistent with that of a typical victim of child sexual abuse. Id. at 376-377.

In accord see *People v. Thorpe*, 504 Mich. 230, 934 N.W.2d 693 (2019), holding that "Although syndrome evidence may be appropriate as a tool for purposes of treatment, we would hold that it is unreliable as an indicator of sexual

abuse." The failure to object was unreasonable.

Prosecution witness Killips testified to the following improper and inadmissible vouching/bolstering testimony during her direct examination without objection from defense counsel:

1. It would not be inconsistent for an abused child to not be able to provide details of every time the child was abused. (TT VI, 131).
2. It is common for children to disclose to a friend. (TT VI, 138).
3. Delayed disclosure is common. (TT VI, 139). She is not surprised at all that MC waited to "disclose" her abuse.13 (TT VI, 146). [13]
4. MC's reaction to the abuse was consistent with that of a sexually abused child. (TT VI, 171).
5. MC's affection towards her grandfather is consistent with a child who has been sexually abused. (TT VI, 173).
6. The fact that MC did not cry or was upset during the sexual assault was consistent with that of a sexually abused child. (TT VI, 176).

To the extent that defense counsel failed to object he was ineffective, to the extent that he did object, the trial court improperly allowed this line of questioning.

The Court of Appeals panel rejected Petitioner's argument commenting that "[D]efense counsel rigorously cross-examined the victim's father about the stark contrast between the victim's calm demeanor while discussing the sexual touching and her visible distress while discussing the Facetime incident. Defense

---

[13] This answer was provided in response to the improper question of, "was the fact that MC didn't disclose right away is that—would that be something inconsistent with a child that was sexually abused?" (TT VI, 146). Defense counsel ineffectively failed to object to this question.

counsel also questioned the victim's parents regarding the sequence of events in which the victim first told SV about the Facetime incident, who informed her mother, who informed the victim's parents." (Opinion, 13, Exh. 3). This led the Court to determine that "Corridore elicited and emphasized testimony that the jury could have interpreted as being inconsistent with abuse." Id. The Court of Appeals unreasonably characterized the record. Defense counsel did not imply or argue that the fact that MC made a statement to a friend somehow implied she was not abused. Nor did counsel allege that MC's reaction to abuse was unreasonable if she were truly sexually assaulted. Counsel also did not attack MC for failing to cry during the assault. Therefore, Killip's testimony was not admissible under well established case law. The prosecution used Killips to vouch for MC that her behavior was further proof of her credibility and Mr. Corridore's guilt. This type of testimony is explicitly inadmissible under *Peterson*, *Beckley* and *Thorpe*. Counsel was ineffective for failing to object and to the extent that he did object, the court erred in allowing the testimony.

The prejudice is heightened where only one witness testified that Petitioner committed any unlawful touching. Whether there is one witness or several, defense counsel is not supposed to give up, but the fewer the witnesses that claim personal knowledge that the defendant committed a crime, the greater is the prejudice.

### e. Counsel was ineffective for eliciting inadmissible expert opinion testimony offered by a lay witness.

During cross-examination of prosecution witness Dr. Marco Corridore, defense counsel asked Dr. Corridore what tipoffs there were that the defendant was sexually assaulting MC. (TT VI, 81). This question opened the door to Dr. Corridore's improper expert testimony. Dr. Corridore testified to the following:

"There had been other things where when my daughter would come back— so my daughter had a couple of problems with abdominal pain. That was completely—we couldn't figure out a reason for it. We took her to a GI specialist. She's had issues where she's had some rectal bleeding. But we thought maybe she was constipated. But she never claimed to have hard stools, they had always been soft even when we put her on Miralax they didn't seem to help her.

She had in issue with – she got hit on the head when she was at school, had a slight concussion and had headaches and we even went to take her to a stress therapist to help her with that when the concussion therapist said look – you know I don't understand why these headaches are persisting. We even got an MRI on her we were so concerned about these sorts of things.

So there's a lot of these abdominal pain, headaches, very classic sort of issues that children were having in dealing with other problems, other stressors in their life. It's very classic sort of sign and symptom of other things that are going wrong.

So the little—the unexplained rectal bleeding, the unexplained abdominal pain, the unexplained headaches that persisted and other little stresses all of these things—and then with my father or the incident over the, the holiday when my daughter refused to sit with U.S. and she was starting to get—she'd always kind of be a little grizzly." (TT VI, 82-83).

This testimony was all bolstered by the fact that at the beginning of cross-examination, Dr. Corridore testified that he has training in what to look for in possible child abuse cases. (TT V, 216). Dr. Corridore's testimony amounted to improper expert testimony where he was not qualified as an expert, the prosecution did not give notice of his expected expert testimony, and his testimony amounted to improper credibility vouching. Additionally, trial counsel should have anticipated that Dr. Corridore might try to testify about MC's medical conditions as a symptom of abuse because it was included in the March 2, 2016, email to Mary Corridore. Counsel should have filed a motion in limine to preclude admission of the statements. Failure to do so was ineffective assistance of counsel.

The Court of Appeals determined that Dr. Corridore's "belief that the victim's ailments may have been connected to Corridore's sexual abuse was a reasonable inference given that there was no other physical explanation for the ailments." (Opinion, 14, Exh. 3). The Court of Appeals observed that the pertinent question was not whether the testimony was admissible but whether counsel was ineffective for eliciting the testimony about the supposed suffering by MC. The Court found that it was not ineffective despite the fact that it opened the door to testimony about possible signs of sexual abuse and unanticipated prejudicial testimony. The Court concluded that even if the cross-examination of Dr. Corridore could have been considered objectively unreasonable it did not affect

the outcome of the trial because it was "not reasonably probable that the limited testimony about 'tipoffs' of sexual abuse was a decisive factor in the jury's determination." Id.

It is unreasonable to apply a rule that effectively holds that nothing presented to a jury affects credibility determinations of testimony of a child, because every child will be believed despite credibility challenges. When trying to determine witness credibility, testimony from a supposed "expert" about what shows sexual abuse can be outcome-determinative.

The Court of Appeals rationale, excusing the inaction by defense counsel, violates well established case law that prohibits a doctor from diagnosing a complainant as being a sexual abuse victim. There is no difference between that type of testimony and Dr. Corridore's testimony, but for the fact that defense counsel recklessly elicited the testimony from Dr. Corridore and did so without explicitly qualifying him as an expert but did ask him about his professional qualifications prior to eliciting the catastrophic testimony.

Dr. Corridore's testimony relied on scientific, and specialized knowledge and amounted to improper credibility vouching where he testified that after it became "known" to him (i.e. someone asserted to him) that MC was sexually abused, her ailments made sense to him because abused children often suffer physical ailments as a way of dealing with stress.

In the instant case, Dr. Corridore was allowed to offer what amounted to expert testimony regarding MC's physical health without establishing his qualifications to do so. Defense counsel should have never elicited this testimony from Dr. Corridore, and defense counsel should have known that Dr. Corridore was prepared to try and provide this testimony at trial where he included his professional opinion in the March 2, 2016, email. Counsel should have filed a motion in limine to preclude the testimony and certainly should not have himself opened the door to such harmful vouching testimony.

Expert testimony by a non-expert, not using scientifically reliable methods, is not admissible or constitutional. *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 589; 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Where the Defendant denied guilt it was the duty of defense counsel to promote that position, *Martin v. Rose*, 747 F.2d 1245 (6th Cir. 1984), instead of implicitly undercutting it by not making challenges to the prosecutor's case.

The critical failure of an attorney to object can be ineffective assistance of counsel if it deprives the defendant of an opportunity for dismissal of the case or for success on appeal. *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996); *Kowalak v. United States*, 645 F.2d 534, 537-538 (6th Cir. 1981); *Corsa v. Anderson*, 443 F. Supp. 176 (ED Mich. 1977). Trial counsel's performance can be deemed deficient based upon the failure to object to highly prejudicial remarks made by the

prosecutor during trial. *United States v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983); *Seehan v. State of Iowa*, 37 F.3d 389 (8th Cir. 1994); *Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985).

Trial counsel's failures, when taken together, cannot be rendered harmless. Mr. Corridore's case was a pure credibility contest and despite that fact he failed to present critical expert testimony that was handed to him on a silver platter, failed to challenge the admissibility of vouching and bolstering testimony, failed to educate the trial court on the relevant case law regarding excited utterances and actively elicited harmful testimony for his client.

It is not necessary to show that the actions of trial counsel would have changed the result. A reviewing court should focus on whether counsel's alleged errors "have undermined the reliability of and confidence in the result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996).

Even if this Honorable Court cannot find that every one of these shortcomings of trial counsel prejudiced Mr. Corridore, the sum total of epic failures requires a finding that Mr. Corridore was prejudiced by his trial counsel's ineffective assistance and his conviction should be vacated and the matter remanded to the trial court.

In rejecting these claims, the Court of Appeals held (Opinion, 14, Exh. 3):

"Even if defense counsel's cross-examination of the victim's father could be considered objectively unreasonable, it did not affect the outcome of the trial. The parties presented voluminous testimony concerning the victim's allegations that Corridore put his hand in her pants and made a lewd request on Facetime."

That is the whole problem. There should not have been "voluminous testimony" of out of court statements and opinion testimony that MC's accusation was truthful. There should have been no such testimony, and defense counsel should have objected to it every time it reared its head.

In *Strickland v. Washington*, supra, the Supreme Court held that prejudice is shown from ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 664. Under *Strickland*, the defendant need not make the higher showing that "counsel's deficient performance more likely than not altered the outcome of the case." 466 U.S. at 693. As the Court held in *Kyles v. Whitley*, 514 U.S. 419; 115 S.Ct. 1555; 131 L.Ed.2d 490 (1995):

> "The question is not whether the defendant would more likely than not have received a different verdict ...., but whether ... he received a fair trial understood as a trial resulting in a verdict worthy of confidence."

There was unfair prejudice. See *Old Chief v. United States*, 519 U.S. 172; 117 S. Ct. 644; 136 L.Ed.2d 574 (1997):

> "'Unfair prejudice' … means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

We cannot have confidence in the verdict from a trial where "voluminous" (Opinion, 14, Exh. 3) prejudicial opinion testimony that the witness was truthful, some of it clothed with scientific credentials, could not help but overwhelm and thus influence the jury. We cannot have confidence in the verdict where, at prosecutor insistence, the jury voted on whether it would be harmful to the complainant if she were not believed, and whether it would a conviction would be good for society, which diverted them from the actual standard, proof beyond a reasonable doubt.

Whenever the testimony of a witness is bolstered by "expert" or "scientific" testimony by witnesses who have no personal knowledge of the truthfulness of the allegations, this causes prejudice. The prejudice is heightened where, as here, only one witness testified that Petitioner committed any unlawful touching.

## IV. THE STATE COURTS ACTED UNREASONABLY BY REFUSING TO HOLD A REQUESTED EVIDENTIARY HEARING ON INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner in state court requested an evidentiary hearing on ineffective assistance of counsel, known in Michigan as a *Ginther* hearing. *People v. Ginther*,

390 Mich. 436; 212 NW2d 922 (1973). He requested it in the Circuit Court in the Motion for New Trial, and from the higher courts thereafter. The Court in *Ginther*, relying on federal law, held:

> "[I]f the record made before a defendant is convicted does not factually support claims he wished to urge on appeal, he should move in the trial court for a new trial or, where the conviction is on a plea of guilty, to set aside the plea, and seek to make a separate record factually supporting the claims.

Well-established United States Supreme Court case law regarding claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 695-696; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984), requires in most cases that an evidentiary hearing be allowed a defendant to prove under the deficiency prong that "counsel's representation fell below an objective standard of reasonableness." *Harrington v. Richter,* 562 U.S. 86 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (internal quotation marks and citation omitted). Speculation about a basis for counsel's decisions does not establish that the performance was sufficient. *Roe v. Flores-Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable.").

Under clearly established United States Supreme Court case law, it is unreasonable for the trial court to make factual findings without holding an evidentiary hearing, and unreasonable state court rulings cannot be sustained.

*Terry Williams v. Taylor*, 529 U.S. 362; 120 S.Ct. 1495; 146 L.Ed.2d 389 (2000).

> "If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." *Taylor v. Mattox*, 366 F.3d 992 (9th Cir. 2004).

The United States Supreme Court in *Schriro v. Landrigan,* 550 U.S. 465; 127 S.Ct. 1933; 167 L.Ed.2d 836 (2007), provided the context within which to review a Petitioner's request for an evidentiary hearing in a habeas proceeding:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. See, e.g., *Mayes v. Gibson*, 210 F. 3d 1284, 1287 (CA10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. See id., at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").

The Sixth Circuit has held that a habeas applicant is generally entitled to an evidentiary hearing if he "alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Sawyer v. Hofbauer,* 299 F.3d 605, 610-11 (6th Cir. 2002) (internal quotation marks and citation omitted).

The provisions of 28 U.S.C. § 2254 do not bar Petitioner's request for an evidentiary hearing, as he has been diligent in seeking an evidentiary hearing in state court and where the state court had not adjudicated the merits of the claims

having made clearly erroneous and objectively unreasonable findings of fact contrary to the record that allowed denial of the claim without making those necessary findings and rulings on the merits of the issues as presented.

This Court should therefore follow the procedure and remedy employed and approved by the Sixth Circuit in *Satterlee v. Wolfenbarger*, 374 F. Supp. 2d 562 (E.D. Mich. 2005), 453 F.3d 362 (6th Cir. 2006), order an evidentiary hearing, and, with or without an evidentiary hearing, provide Habeas Corpus relief to petitioner for ineffective assistance of counsel.


## <u>RELIEF REQUESTED</u>

Petitioner Frank Corridore moves this Honorable Court to grant the following:

A.  Accept jurisdiction over this case;

B.  Require Respondent to appear and answer the allegations in this Petition and Brief in Support;

C.  Allow Petitioner to file such briefs and exhibits as this Court may require on the questions raised by Petition;

D.  Conduct an evidentiary hearing on ineffective assistance of counsel, or direct the state court to do so;

E.  Issue an Order granting Habeas Corpus relief requiring a new trial;

F.   Issue a Writ of Habeas Corpus freeing Petitioner from his
     unconstitutional deprivation of liberty.

G.   Grant such other further and different relief as the Court
     may deem just and proper under the circumstances.

                              Respectfully Submitted

                              /s/Alona Sharon
                              ALONA SHARON (P68782)
                              Attorney for Petitioner
                              28411 Northwestern Highway
                              Suite 875
                              Southfield, MI 48034
                              (248) 545-4755
                              alonamac@aol.com

DATED:  April 14, 2021