# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 23, 2023

Ms. Miriam J. Aukerman
American Civil Liberties Union Fund of Michigan
1514 Wealthy Street, S.E.
Suite 242
Grand Rapids, MI 49506

Ms. Allison Beth Frankel
Ms. Trisha Trigilio
American Civil Liberties Union
Reproductive Freedom Unit
125 Broad Street
18th Floor
New York, NY 10004

Mr. Eric Jenkins
Mr. John S. Pallas
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48909

Mr. Daniel S. Korobkin
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Jonathan M. Manes
Roderick & Solange MacArthur Justice Center
160 E. Grand Avenue
Sixth Floor
Chicago, IL 60611

Mr. Rohit Subramaniam Rajan
Federal Public Defender's Office
District of Nevada
411 E. Bonneville Avenue, Suite 250
Las Vegas, NV 89101

Ms. Devi Rao
Roderick & Solange MacArthur Justice Center
501 H Street, N.E.
Suite 275
Washington, DC 20002

Re: Case No. 22-1301, *Frank Corridore v. Heidi Washington*
Originating Case No. : 2:21-cv-10834

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

FRANK CORRIDORE,

        *Petitioner-Appellant,*

    *v.*

HEIDI E. WASHINGTON, Warden,

        *Respondent-Appellee.*

No. 22-1301

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10834—Paul D. Borman, District Judge.

Argued: March 15, 2023

Decided and Filed: June 23, 2023

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Rohit Rajan, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Grand Rapids, Michigan, for Appellant. Eric R. Jenkins, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Rohit Rajan, Miriam J. Aukerman, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Grand Rapids, Michigan, Daniel S. Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Yazmine Nichols, Allison Frankel, Trisha Trigilio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellant. Eric R. Jenkins, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. Devi M. Rao, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., Jonathan Manes, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

    NALBANDIAN, J., delivered the opinion of the court in which THAPAR, J., joined. MOORE, J. (pp. 14–27), delivered a separate dissenting opinion.

---

## OPINION

---

NALBANDIAN, Circuit Judge. A Michigan jury convicted Frank Corridore of second-degree sexual criminal conduct for sexually abusing his granddaughter. Corridore appealed his conviction in state court but to no avail. By the time he filed a habeas petition in federal district court, he had been released from prison and discharged from parole. So the district court dismissed the petition, explaining that Corridore was no longer in custody and therefore could not meet the requirements of 28 U.S.C. § 2254. Corridore appeals, arguing that he is subject to lifetime sex-offender registration and electronic monitoring—requirements that he says meet the custody requirement. We disagree and affirm.

## I.

In 2017, a Michigan jury convicted Frank Corridore of sexually abusing his granddaughter, and he was sentenced to 19 months to 15 years in prison. Along with a prison sentence, he became subject to mandatory lifetime electronic monitoring ("LEM") via a permanent ankle bracelet and sex offender registration under Michigan's Sex Offenders Registration Act ("SORA"). Corridore appealed his conviction in the Michigan Court of Appeals. And that court affirmed his conviction. *See People v. Corridore*, No. 338670, 2019 WL 2711227, at *1 (Mich. Ct. App. June 27, 2019). He also sought and was denied leave to appeal to the Michigan Supreme Court. *See People v. Corridore*, 941 N.W.2d 53 (Mich. 2020) (order).

Corridore then filed his habeas petition in federal district court. By then, Corridore had been released from prison. And his LEM and SORA requirements had kicked in. He argued that these "twin burdens" rendered him in custody—a fact he had to prove for the district court to have jurisdiction over his habeas petition. (R. 1, Habeas Petition, p. 10.); *see* 28 U.S.C. § 2254(a) (explaining that a district court can "entertain an application for a writ of habeas corpus . . . only on the ground that [a petitioner] is *in custody* in violation of the Constitution or laws or treaties of the United States" (emphasis added)). And he noted that while the Sixth

Circuit had declined to find that Ohio's SORA met the "in custody" requirement, whether LEM constituted being "in custody" was an open question. (R. 1, Habeas Petition, p. 11.) And his petition addressed only the LEM requirements—not Michigan's SORA requirements. The State moved to dismiss. It argued that Corridore was no longer in custody and therefore that the district court didn't have jurisdiction.

The district court explained that "[t]he critical question . . . is whether being subjected to LEM qualified as custody under the habeas statutes." (R. 8, Opinion, p. 7.) While acknowledging that LEM is "uncomfortable, burdensome, and embarrassing to wear at times," the district court said that LEM did not restrain Corridore's physical liberty—and thus was not "custodial." (*Id.* at 9 (citation omitted).) Instead, the district court held, LEM is a "collateral consequence" of conviction. (*Id.* at 10.) So because Corridore failed to meet the custody requirement under the district court's analysis, the district court dismissed for lack of jurisdiction but granted a certificate of appealability "as to whether [Corridore] is in custody for purposes of habeas relief." (*Id.* at 11.) Corridore timely appealed.

## II.

We review the dismissal of a habeas petition based on a lack of subject matter jurisdiction de novo. *Hautzenroeder v. DeWine*, 887 F.3d 737, 740 (6th Cir. 2018). And Corridore bears the burden of proving that he is in custody. *See id.* (citing *Brott v. United States*, 858 F.3d 425, 528 (6th Cir. 2017)).

Corridore makes two arguments on appeal. First, he says that Michigan's LEM renders him "in custody." Second, he argues that even if LEM alone doesn't satisfy the custody requirement, SORA either alone or along with LEM does.

First, a word on what it means to be "in custody" under 28 U.S.C. § 2254. Then we'll take each of Corridore's arguments in turn.

### A.

Start with the custody requirement. Since the Founding, Congress has limited the federal courts' power to grant the writ of habeas corpus only to those who are "in custody."

Judiciary Act of 1789, 1 Stat. 73, 82 (1789). And that holds true today. Under the modern habeas statute, we can only review petitions of those who are "in custody." *See* 28 U.S.C. § 2254(a).

Historically, "in custody" meant physical restraint or imprisonment. And that makes sense. Habeas corpus literally means in Latin "(that) you have the body." *See Clements v. Florida*, 59 F.4th 1204, 1218 (11th Cir. 2023) (Newsom, J., concurring); *id.* at 1220 ("If there was any single feature that characterized the writ of habeas corpus in both its early statutory and common-law forms, it was the requirement that adult prisoners be subject to an immediate and confining restraint on their liberty." (quoting Dallin H. Oaks, *Legal History in the High Court— Habeas Corpus*, 64 Mich. L. Rev. 451, 469 (1966))).

But the Supreme Court broadened the conception of "in custody" in two cases: *Jones v. Cunningham*, 371 U.S. 236 (1963), and *Hensley v. Municipal Court*, 411 U.S. 345 (1973). In *Jones*, the Court started by explaining that "[h]istory, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." 371 U.S. at 240. Then the Court held that Virginia's parole regime rendered a petitioner in custody. *Id.* at 243.

As a result of his parole, the petitioner in *Jones* was "confined . . . to a particular community, house, and job at the sufferance of his parole officer." *Id.* at 242. He couldn't "drive a car without permission" and had to "report to his parole officer, permit the officer to visit his home and job at any time, and follow the officer's advice" to "keep good company and good hours, work regularly, keep away from undesirable places, and live a clean, honest, and temperate life." *Id.* And if he didn't follow these conditions, he could have been "rearrested at any time . . . and thrown back in jail to finish serving the allegedly invalid sentence with few . . . procedural safeguards." *Id.*

The Court held that all these requirements showed that the petitioner was "in custody," even though he was not physically confined in, for instance, a prison. *See id.* at 243 ("While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions

which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board within the meaning of the habeas corpus statute.").

And, following up on *Jones*, in *Hensley*, the Court held that a recognizance bond[1] counted as being "in custody" where the petitioner had to "appear at all times and places as ordered by the court" and where the court could "revoke the order of release" if he failed to appear. *See Hensley*, 411 U.S. at 348. That's because the petitioner couldn't "come and go as he please[d]" and "[h]is freedom of movement rest[ed] in the hands of state judicial officers, who [could] demand his presence at any time and without a moment's notice." *Id.* at 351.

Following the Supreme Court's lead, we've typically found that a petitioner is "in custody" when "the government exercise[s] direct control" over a petitioner's actions—even when the petitioner isn't behind bars. *Hautzenroeder*, 887 F.3d at 741. For instance, "500 hours of community service" plus "one year non-reporting probation" satisfied the in-custody requirement. *Lawrence v. 48th Dist. Ct.*, 560 F.3d 475, 479–81 (6th Cir. 2009). And a stayed one-year probation sentence also met the "in custody" requirement. *McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir. 1989); *see also Malinovsky v. Ct. of Common Pleas*, 7 F.3d 1263, 1265 (6th Cir. 1993) (holding that because the petitioner was "released on a personal recognizance bond" he met the "in custody" requirement). We recognized that in each of those situations the petitioner was "subject to restraints not shared by the public generally," specifically because the petitioner was subject to direct governmental control and couldn't "come and go" as he pleased. *Lawrence*, 560 F.3d at 480.

But not all restraints on liberty are severe enough to meet the "in custody" requirement. That's because "*the collateral consequences* of [a] conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it." *Hautzenroeder*, 887 F.3d at 740 (quoting *Maleng v. Cook*, 490 U.S. 488, 492 (1989) (per curiam)). Losing the right to vote, not being able to serve on a jury, not being able to engage in certain businesses, and having to comply with certain sex-offender registration requirements—like not being able to live

---

[1] After the petitioner's conviction in state court, he "ha[d] been enlarged on his own recognizance" at "all times," meaning that after "giving bail" he had been "release[d]" subject to complying with the recognizance statute. *Hensley*, 411 U.S. at 347–48.

within 1,000 feet of a school or having to register as a sex-offender—are all collateral consequences of conviction. *See id.* at 740–42; *Carafas v. LaVallee*, 391 U.S. 234, 237 (1968).

And in the sex-offender context, we've rejected arguments that consequences like social stigma from the dissemination of sex-offender registration information to the public or criminal consequences for failure to comply with reporting requirements render a petitioner "in custody." *Hautzenroeder*, 887 F.3d at 744. That's because those obligations don't exert direct government control over a petitioner's movement.

And whether a requirement is "punitive . . . leaves unanswered the 'in custody' question." *Id.* We evaluate the punitive nature of a requirement when we're doing an Ex Post Facto Clause analysis. *See Does #1–5 v. Snyder*, 834 F.3d 696, 700–01 (6th Cir. 2016). But the "in custody" analysis "does not hinge on the punitive nature of the statute." *Hautzenroeder*, 887 F.3d at 744.

So keeping the main thing the main thing—whether a petitioner's movement is limited because of direct government control and therefore amounts to a severe restraint on liberty—we turn back to Corridore's obligations under LEM and SORA.

## B.

LEM first. Michigan's LEM scheme is undoubtedly intrusive. Corridore's movements have been tracked since his release from prison and will be tracked for the rest of his life—all via a chargeable ankle bracelet. *See* Mich. Comp. Laws § 791.285(1)(a)–(b). He is tracked in real and recorded time. *Id.*

The device isn't battery operated. And Corridore has to charge it "on a standard 110 volt electrical current outlet for two (2) continuous hours in each 24 hour period." *See* Mich. Dep't Corrections, *Lifetime Electronic Monitoring Program Participant Agreement*, https://bit.ly/3bumWWu. If the device vibrates or activates one of its LED lights, Corridore must "[r]espond . . . as directed by" the Michigan Department of Corrections ("MDOC"). *Id.* The LED light turns red when the device loses GPS connectivity. *Id.* In that circumstance, Corridore must "[w]alk outside . . . to an area with a clear view of the sky." *Id.* A "clear view of the sky" means he can't "stand under trees, building awnings, etc." *Id.* Then, he must wait for

the light to turn off. MDOC also instructs him not to "[d]escend[] in excess of 60 feet below the surface of any body of water." *Id.*

Upon MDOC's request, Corridore must allow personnel "to visually inspect the electronic monitoring ankle bracelet and/or electronic monitoring charging cord." *Id.* And if MDOC needs to "change or replace" the device, Corridore must "make [himself] immediately available to [MDOC] staff." If Corridore damages the device, he must reimburse MDOC. *Id.*

Corridore must "monitor the [MDOC] internet website . . . at least monthly for special instructions and/or financial information regarding the cost of [his] electronic monitoring." *Id.* And he must pay a $60 monthly fee to upkeep the device. If he doesn't pay, he could spend up to two years in prison and could have to pay a fine of up to $2,000.[2] Mich. Comp. Laws §§ 750.520n(2)(a)–(c),791.285(2). Corridore argues that all the obligations of LEM add up to being "in custody."

Most would agree that these requirements are intrusive and beyond what the typical person is subjected to. But that's not the question. The question is whether all these requirements limit Corridore's physical movement to the point that they are severe restraints on liberty. *See Hautzenroeder*, 887 F.3d at 741. They're not. They are simply collateral consequences of conviction. And our caselaw shows why.

In *Hautzenroeder*, we evaluated Ohio's similar sex-offender registration laws.[3] Because of Hautzenroeder's offense, she had to live more than 1,000 feet away from school premises. *See* Ohio Rev. Code § 2950.034(A)–(B). She had to personally register with the sheriff of the county in which she lived, worked, and went to school. *Id.* § 2950.04. And as a Tier III sex offender in Ohio, Hautzenroeder's in-person registration process restarted every ninety days— meaning Hautzenroeder had to check in with the sheriff four times a year. *Id.* § 2950.06(A),

---

[2]Corridore makes no specific argument as to the $60 monthly fee, but we note that even if we conceived of the fee as a fine, a "monetary fine is not a sufficient restraint on liberty to meet the 'in custody' requirement for § 225[4] purposes." *United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995) (citation omitted).

[3]We evaluated an earlier version of Ohio's sex-offender registration requirements in *Leslie v. Randle*. *See* 296 F.3d 518, 522–23 (6th Cir. 2002) (deciding that those requirements were "more analogous to collateral consequences such as the loss of the right to vote than to severe restraints on freedom of movement such as parole").

(B)(3), (C)(1).  Hautzenroeder also had to provide a host of information for Ohio's internet registry—things like travel documents, license plate numbers, DNA specimen, and mental health treatment.  *Id.* §§ 2950.04(B), (C), 2950.13(A), 2950.14(B).  And the sheriff was required by statute to let the surrounding community know that Hautzenroeder was a sex offender.  *Id.* § 2950.11(A).  And if Hautzenroeder violated these requirements, she faced potential prison time.  *Id.* § 2950.99(A)(1).

Even in the face of all these requirements, we said that Ohio's sex-offender registration requirements were collateral consequences of conviction rather than severe restraints on liberty. We explained that "Hautzenroeder's freedom of movement [wa]s unconstrained, her registration and reporting obligations notwithstanding."  *Hautzenroeder*, 887 F.3d at 741.  We compared Ohio's laws to the parole in *Jones* and the recognizance bond in *Hensley* and held that "[t]hough registration obligations present a serious nuisance," they don't get at the heart of "in custody" like the requirements in *Jones* and *Hensley*.  That's because Hautzenroeder's requirements didn't amount to the government's "direct control over [her] movements."  *Id.*  Hautzenroeder didn't need permission to move about or live or work where she pleased.  *Id.*  Any restrictions on movement—such as not being able to live near a school or social stigma—were collateral consequences of her conviction.  *Id.* at 742; *cf. Westberry v. Keith*, 434 F.2d 623, 625 (5th Cir. 1970) (per curiam) (holding that the revocation of a petitioner's driver's license did not render her "in custody" because to hold otherwise "would go far beyond that degree of confinement found sufficient in *Jones*").

Addressing Hautzenroeder's arguments, we noted that any criminal conviction resulting from violating the registration requirements would be a separate criminal violation—not a continuation of the initial sex offense.  *Hautzenroeder*, 887 F.3d at 743 (explaining that this was not "reimprisonment stemming from her original conviction").  And the fact that the requirements were part of the sentence didn't tell us anything about the "in custody" requirement.  *Id.* at 744 ("Whether a registration scheme is punitive for ex post facto purposes leaves unanswered the 'in custody' question.").

Now to Corridore's case.  Corridore argues that because his device must be charged for two hours every day he is prevented from "traveling to or staying in any location that does not

have reliable access to electricity." (Appellant's Br. at 25.) He explains that he can't go camping or engage in "occupations such as long-haul truck driving." (*Id.*) He also says that he is "effectively barr[ed] . . . from swimming," for fear that he would damage his device (although the Government disputes this characterization). (*Id.* at 26.) He also argues that he is limited to spaces that have internet connectivity because his device requires constant connectivity.[4] And he says that the Michigan Supreme Court has characterized LEM as punitive, so we should treat it as custodial. He also argues that he must now live with the stigma of having to wear a GPS device, which ostracizes him from social and civic life. Finally, he says that he must live in fear of violating Michigan's LEM requirements and facing prosecution.

Corridore's LEM requirements fail to meet the "in custody" requirement for the same reason the sex-offender registration requirements in *Hautzenroeder* did: they're collateral consequences of conviction rather than severe restraints on liberty.

Starting with the restraints on his movement, the LEM requirements do not allow the government to exercise "direct control" over Corridore's movements. *Hautzenroeder*, 887 F.3d at 741; *see also Munoz v. Smith*, 17 F.4th 1237, 1245 (9th Cir. 2021) (holding that lifetime electronic monitoring did not render the petitioner in custody because it did "not limit his physical movement"). Under LEM, Corridore must wear the device. But by the terms of Michigan's statutory scheme and LEM agreement, Corridore can go where he wants, so long as he keeps the device charged and tracking. *Cf. Nowakowski v. New York*, 835 F.3d 210, 217 (2d Cir. 2016) (explaining that a petitioner was in custody when he was under a "one-year conditional discharge" with one day of community service because his "physical presence [was required] at particular times and locations, both for community service and court appearances"). Corridore can charge on any standard outlet he wants. And he can do it while he's sleeping or

---

[4]Corridore's habeas petition does not address any circumstances where these fears have manifested. He doesn't say that his device has ever malfunctioned or that he has had a problem bathing or swimming. He doesn't say that he tried long-haul truck driving and found it infeasible or that the device's connectivity has been unreliable in practice. He only suggests what might happen in the future because of LEM's general conditions. *See Munoz v. Smith*, 17 F.4th 1237, 1246 (9th Cir. 2021) (explaining that "regardless of whether a . . . requirement could in some particularly inhibiting circumstances create a severe or significant restraint on an offender's physical liberty, . . . [petitioner] ha[d] not shown that his . . . [wa]s a 'custodial' one under § 2254" (citation omitted)).

watching television or eating breakfast. That's not the kind of direct control on movement that meets the "in custody" requirement.

True, the device's connectivity requirement might keep Corridore from going to areas without electricity for extended periods of time, prevent him from diving below 60 feet of water, or prohibit him from long-haul truck driving. But those kinds of restraints on movement are incidental rather than direct, like the restriction in *Hautzenroeder* that sex offenders couldn't live within 1,000 feet of a school or like statutes that prohibit certain offenders from having a driver's license. *See Hautzenroeder*, 887 F.3d at 742; *Westberry*, 434 F.2d at 624–25. Such restrictions are collateral consequences because they don't involve "direct control" by the government—the key analysis of the parole requirements in *Jones* and the recognizance bond in *Hensley*. *Hautzenroeder*, 887 F.3d at 741. An incidental effect on movement is not severe enough to meet the "in custody" requirement.[5]

Turning to Corridore's other arguments, he says that LEM is punitive and therefore contributes to a finding that LEM is custodial. We disagree. We've already addressed this argument in *Hautzenroeder*. Whether an LEM regime is punitive matters for an Ex Post Facto

---

[5] We're only aware of one other circuit to have addressed LEM. In *Munoz v. Smith*, the Ninth Circuit agreed that LEM requirements similar to those in our case do not meet the "'in custody' requirement" because they "neither target[] petitioner's movement in order to impose special requirements, nor do[] [they] demand his physical presence at any time or place." 17 F.4th at 1245 (cleaned up). "[They] also [don't] prevent him from going anywhere." *Id.* (cleaned up). Even though the petitioner had to "appear in person 'every few months' to register" his LEM and had to obtain approval for where he lived from the state, the Ninth Circuit held that these were not a "severe, immediate restraint on his physical liberty." *Id.* at 1246. Corridore neither has to report in person regularly nor seek approval for any of his life decisions under LEM. So his requirements are even less restrictive than those in *Munoz*. And we join the Ninth Circuit in holding that in the face of these *de minimis* burdens on movement, Corridore is not in custody.

Corridore argues that *Munoz* is inapposite. Instead, he asks us to adopt the Third Circuit's view of custody as expressed in *Piasecki v. Court of Common Pleas*—a sex-offender registration case. *See* 917 F.3d 161 (3d Cir. 2019). There, the petitioner was required to register as a sex offender under Pennsylvania law and had to check in every three months with the state police for the rest of his life. *See id.* at 164. He also had to appear in person if he changed his name, address, employment, student status, phone number, vehicle, lodging, email address, or professional license. *Id.* at 164–65. He also had to report in person 21 days before international travel. *Id.* at 165. And the Third Circuit, relying heavily on its precedent and acknowledging that it was departing from the view of other circuits (including ours), held that the petitioner was in custody—even if the government played only an "oversight" function. *Id.* at 171–72 & n.83 (citation omitted). Setting aside that Corridore's LEM does not have all the requirements listed in *Piasecki*, in *Hautzenroeder* we addressed Ohio's substantially similar sex-offender registration statute and came out the opposite way—partially because we require more than government "oversight" to meet the "in custody" requirement. *Id.* at 172 (citation omitted). We require direct government control over movement. *Hautzenroeder*, 887 F.3d at 741. So we find Corridore's argument based on *Piasecki* unpersuasive.

Clause analysis. *See Does #1–5*, 834 F.3d at 700–01. But "[w]hether a registration scheme is punitive for ex post facto purposes leaves unanswered the 'in custody' question." *Hautzenroeder*, 887 F.3d at 744. So Michigan's punitive label doesn't affect our "in custody" analysis.

Corridore also says that LEM "severely burdens participation in civic and social life." (Appellant's Br. at 27.) But that has never been a factor in our analysis of "in custody" cases, as we made clear in *Hautzenroeder*. 887 F.3d at 741–42 (rejecting the argument that sex-offender registration requirements would "chill[] registrants' freedom of movement" and "transform[] her conviction into a scarlet letter" in the community). We have often acknowledged that collateral consequences can be burdensome. Yet they remain just that—collateral consequences. *See id.* Finally, Corridore argues that he must live in fear of facing criminal charges for accidentally messing up his GPS device in some way. But we've shut down that argument before because "any repercussions [for statutory violations] would stem not from [the] original conviction but from a new, separate criminal proceeding." *Id.* at 743.

So none of Corridore's LEM arguments gets him from a collateral consequence to a severe restraint on liberty.

## C.

Now we turn to SORA. Corridore argues that even if LEM alone doesn't meet the "in custody" requirement, SORA alone or along with LEM does. But not so fast to the merits. Corridore devoted a single line to SORA in his habeas petition: "Petitioner remains under twin burdens for life: lifetime electronic monitoring (LEM) and sex offender registration (SOR)." (R. 1 Petition, p. 10.) Then based on our holding in *Hautzenroeder*, Corridore stated that our Circuit "has held that SOR does not constitute custody." (*Id.* at 11 (citing *Hautzenroeder*, 887 F.3d at 740).) He then spent ten pages of his petition on how LEM meets the "in custody" requirement. He closed with this: "This Court should find that requiring Petitioner to wear a box attached to his body for his whole life, while undergoing warrantless transmission of his location information every second, causes Petitioner to suffer a sufficiently severe deprivation of liberty that it constitutes custody for purposes of federal Habeas Corpus." (*Id.* at 10.)

The district court's dismissal order interpreted Corridore's habeas petition as posing "[t]he critical question . . . whether being subjected to LEM qualifies as custody under the habeas statutes." (R. 8, Opinion, p. 7.) In dismissing the petition and granting a certificate of appealability, the district court never addressed SORA—likely because Corridore never raised an affirmative argument on SORA in his petition.

Corridore, who was represented by counsel below, argues that the single line in his petition referencing the "twin burdens" of LEM and SORA preserved his SORA arguments on appeal. But a "one sentence argument . . . is . . . insufficient to preserve [an] argument on appeal." *Moore v. Lafayette Life Ins.*, 458 F.3d 416, 448 (6th Cir. 2006); *see also United States v. Mullet*, 822 F.3d 842, 849 (6th Cir. 2016) ("To preserve an argument, it does not suffice to mention a point obliquely, then focus the rest of the brief on other arguments."); *cf. Davis v. Cintas Corp.*, 717 F.3d 476, 494 (6th Cir. 2013) ("Such a perfunctory, unsubstantiated statement does not preserve the issue for appeal."). So Corridore forfeited any argument he had on SORA by not raising it below.

But even if we reached his arguments on SORA, we'd come out the same way. Start with the SORA requirements. Corridore must report changes to his address, employment, name, and schooling in person within three business days. Mich. Comp. Laws §§ 28.724a, 28.725. And if he changes his vehicle, email address, or telephone number, he must notify MDOC by mail. *Id.* § 28.725(2)(a). If he plans to travel for more than seven days, he must report that information. *Id.* § 28.725(2)(b). And he must report in person four times a year to the local department. *Id.* § 28.725a(3)(c). If local law enforcement receives a tip that he is not complying with the sex-offender registration requirements, officers may search his home.[6] *See People v. Betts*, 968 N.W.2d 497, 510 (Mich. 2021). And Corridore is subject to criminal penalties of up to ten years if he violates SORA. Mich. Comp. Laws § 28.729.

---

[6]Corridore says that "[r]egistrants are also subject to ongoing supervision, including home visits and compliance sweeps." (Appellant's Br. at 34.) But that's only the case when the registrant is on parole. *See* Mich. Comp. Laws § 791.236(19) ("The parole order must require the parolee to provide written consent to submit to a search of his or her person or property upon demand by a peace officer or parole officer . . . . Consent to a search as provided under this subsection does not authorize a search that is conducted with the sole intent to intimidate or harass."). Compliance sweeps are just a feature of parole—not a feature of lifetime electronic monitoring.

If all these requirements sound familiar, it's because they are.  We analyzed Ohio's almost identical regime in *Hautzenroeder* and found that the petitioner there still wasn't "in custody."  Corridore can't point to any significant differences in Michigan's scheme that would lead us to come out the other way in his case.  *See Clements*, 59 F.4th at 1215 (determining that Florida's similar sex-offender registration statute—with in-person reporting requirements—did not amount to being "in custody").

Corridore makes the alternative argument that even if SORA alone or LEM alone isn't enough to meet the "in custody" requirement, the combination of the two is.  We find that argument unpersuasive because neither LEM nor SORA encompasses custodial requirements.  So the combination of LEM and SORA—both collateral consequences—doesn't do much to get Corridore closer to the mark.  That's because each requirement in a habeas analysis is either custodial or a collateral consequence of conviction.  In other words, a series of collateral consequences doesn't equal the "in custody" requirement because none of the items in that series are severe restraints on the petitioner's liberty.  *See Maleng*, 490 U.S. at 492 ("[O]nce the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack on it."); *Hautzenroeder*, 887 F.3d at 741 ("[E]ven grievous collateral consequences stemming directly from a conviction cannot, without more, transform the absence of custody into the presence of custody." (citation omitted)); *cf. Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence . . . .  They do not; zero plus zero is zero.").

### III.

For these reasons, we affirm.

———————————

## DISSENT

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. At every stage, Frank Corridore has diligently and timely pursued his state and federal remedies to challenge his conviction and sentence through the direct appeal and postconviction process. Prior to filing his federal habeas petition, however, Corridore was released from prison and discharged from formal parole. Corridore nevertheless remains subject to electronic monitoring and sex-offender registration for the remainder of his life. These punishments—mandatorily imposed as part of Corridore's sentence—create substantial restraints on his liberty that the average person would consider to be onerous and oppressive. Lifetime electronic monitoring ensures that Corridore's every movement will be tracked by the state for the rest of his life; that he cannot participate in certain employment or recreational activities; that the state can demand his immediate physical presence at any time; and that one month out of every year of his life will be spent physically tethered to an electrical outlet, charging his monitoring device.

The majority decides that these significant burdens on Corridore's liberty and freedom of movement are insufficient to place him "in custody" within the meaning of 28 U.S.C. §§ 2241(c)(3), 2254(a), and that therefore the district court lacked jurisdiction to adjudicate his habeas petition. Because Corridore has demonstrated that the burdens of lifetime electronic monitoring and sex-offender registration pose significant restraints on his liberty, I cannot agree. The result of the majority's opinion is that an individual subject to highly invasive lifetime supervision resulting from a constitutionally defective conviction or sentence will have no recourse to vindicate their rights in federal court. Such a result is legally intolerable. I would reverse the district court's judgment dismissing Corridore's habeas petition for lack of jurisdiction and remand for further proceedings. I therefore respectfully dissent.

## I. THE "IN CUSTODY" REQUIREMENT

Before turning to the specifics of Corridore's case, I start with a review of the "in custody" requirement. Federal courts "shall entertain an application for a writ of habeas corpus

[o]n behalf of a person *in custody* pursuant to the judgment of a State court only on the ground that he is *in custody* in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphases added). This circuit has held that "[t]his language is jurisdictional: if a petitioner is not 'in custody' when she files her petition, courts may not consider it." *Hautzenroeder v. DeWine*, 887 F.3d 737, 740 (6th Cir. 2018).

The Supreme Court has held that a petitioner is in custody if they are subject to conditions that "significantly restrain petitioner's liberty to do those things which in this country free men are entitled to do." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). This is because the writ of habeas corpus "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Id.* Habeas jurisdiction is therefore not limited to those who are imprisoned or otherwise physically detained. *Id.* at 240. Not all consequences that flow from a conviction, however, suffice to bestow federal habeas jurisdiction: "once the sentence imposed for a conviction has completely expired, the *collateral consequences* of that conviction are not sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it." *Maleng v. Cook*, 490 U.S. 488, 492 (1989) (per curiam) (emphasis added).

Federal courts have held that an array of conditions suffice to confer federal habeas jurisdiction. *See Nowakowski v. New York*, 835 F.3d 210, 216 (2d Cir. 2016) (collecting cases). In *Jones*, for example, the Supreme Court held that a person on parole in Virginia was in custody for purposes of federal habeas jurisdiction. 371 U.S. at 243. The Court has also held that a person released on bail or on their own recognizance is in custody. *Hensley v. Mun. Ct., San Jose-Milpitas Jud. Dist.*, 411 U.S. 345, 353 (1973). Other examples of conditions that federal courts have held are custodial include probation, community service, post-release supervision, and mandatory programs. *Lawrence v. 48th Dist. Ct.*, 560 F.3d 475, 480–81 (6th Cir. 2009) (non-reporting probation and community service); *In re Stansell*, 828 F.3d 412, 418 (6th Cir. 2016) (supervised release); *Earley v. Murray*, 451 F.3d 71, 75 (2d Cir. 2006) (post-release supervision); *Dow v. Cir. Ct. of 1st Cir. Through Huddy*, 995 F.2d 922, 923 (9th Cir. 1993) (per curiam) (mandatory fourteen-hour alcohol rehabilitation program).

In discerning whether certain conditions constitute a significant restraint on the petitioner's liberty, this court looks at whether they are "more analogous to collateral consequences such as the loss of the right to vote than to severe restraints on freedom of movement such as parole." *Hautzenroeder*, 887 F.3d at 740 (quoting *Leslie v. Randle*, 296 F.3d 518, 522–23 (6th Cir. 2002)). One factor that this court has relied on in making this determination is "whether the legal disability in question somehow limits the putative habeas petitioner's movement." *Leslie*, 296 F.3d at 522 (quoting *Williamson v. Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998)). Another factor is whether the relevant statute "is remedial as opposed to punitive in nature," because another court's determination that the statute "is a form of civil regulation provides additional support" for a conclusion that the restraint is more analogous to a collateral consequence. *Id.* at 522–23. This factor is not dispositive, however, because "the 'in custody' requirement may be satisfied by restraints other than criminal punishment." *Id.* at 523 (quoting *Williamson*, 151 F.3d at 1184).

Other circuits have also looked at whether the "restrictions were imposed as part of [the petitioner's] sentence," because that negates an inference that the restraints "were merely collateral consequences" of the underlying conviction. *Piasecki v. Ct. of Common Pleas*, 917 F.3d 161, 173 (3d Cir. 2019). Likewise, ongoing or continuing governmental supervision is often an indication of a custodial restraint. *See Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 161 (3d Cir. 1997).

## II.  LIFETIME ELECTRONIC MONITORING

### A.  Michigan's Lifetime Electronic Monitoring Program

Under Michigan law, lifetime electronic monitoring ("LEM") is a mandatory component of Corridore's sentence. Mich. Comp. Laws Ann. §§ 750.520c(2)(b), 750.520n(1). The Michigan Department of Corrections ("MDOC") has "exclusive jurisdiction" over the administration of the LEM program. *Id.* § 791.204(d). The LEM program "must accomplish" the following objectives:

> (a) By electronic means, track the movement and location of each individual from the time the individual is released on parole or from prison until the time of the individual's death.

(b) Develop methods by which the individual's movement and location may be determined, both in real time and recorded time, and recorded information retrieved upon request by the court or a law enforcement agency.

*Id.* § 791.285(1).  Any person who is "sentenced to" LEM "shall wear or otherwise carry an electronic monitoring device as determined by [MDOC] . . . in the manner prescribed." *Id.* § 791.285(2).  Those who have been discharged from parole but are still subject to LEM—like Corridore—must reimburse MDOC sixty dollars per month for the program. *Id.* Failure to do so constitutes "a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both." *Id.* § 750.520n(2)(c).  Likewise, "[i]ntentionally remov[ing], defac[ing], alter[ing], destroy[ing], or fail[ing] to maintain the electronic monitoring device in working order" and failing "to notify [MDOC] that the electronic monitoring device is damaged" are also felonies punishable by up to two years' imprisonment. *Id.* § 750.520n(2)(a), (b).

MDOC also has additional requirements for those sentenced to LEM, outlined in the LEM program participant agreement.  MDOC, *Lifetime Electronic Monitoring Program Participant Agreement* ("LEM Rules"), https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/LG/Lifetime_GPS_Agreement_Form_050911_353535_7.pdf?rev=7a99b1e7142346c3b89f75ebac873c03&hash=D1DF30F1B55F5D194AAAC052193B2BA2 (last visited May 19, 2023).  The LEM device must be charged "for two (2) continuous hours in each 24 hour period." *Id.* at 2.  Because people subject to LEM must "not remove or attempt to remove the electronic monitoring tracking device from [their] ankle at any time," *id.* at 1, charging the LEM device requires the person to be physically tethered to an electric outlet for two hours out of every twenty-four hour period.  A person subject to LEM must "make [themselves] immediately available" to MDOC staff in the event that the device needs to be changed or replaced and must also allow MDOC staff or law enforcement to "visually inspect" the device or charger upon request. *Id.* at 2.  If a person subject to LEM leaves Michigan, they "may be required to return to the State of Michigan to have the electronic monitoring equipment inspected" by MDOC staff. *Id.* at 1.  They are also required to respond to vibrations and flashing LED lights on the LEM device, which indicate problems with the device or the need to contact MDOC. *Id.* at 1, 4.  If the GPS LED flashes red, the person must "[w]alk outside with the [device] uncovered to an area with a clear view of the sky," which means that the person should

not "stand under trees, building awnings," or similar obstructions until the GPS LED turns off, so that the device can reconnect to GPS. *Id.* at 4. If all three LEDs flash red, an "agent has sent an alert for [the person] to contact them" and the person must press the acknowledge button on the LEM device and then contact the agent at a designated phone number. *Id.*

## B. Lifetime Electronic Monitoring and the "in Custody" Requirement

Considering the factors identified above, LEM constitutes a significant restraint on Corridore's liberty. LEM certainly "limits the putative habeas petitioner's movement." *Leslie*, 296 F.3d at 522 (quoting *Williamson*, 151 F.3d at 1183). Because the device must be charged for two hours out of every twenty-four hour period, a person subject to LEM must be physically tethered to an electrical outlet, uninterrupted, for two hours per day. Put differently, one month out of every year of the person's life will be spent connected to an electrical outlet. Those subject to LEM cannot travel to places lacking reliable access to electricity or GPS signal. *Riley v. N.J. State Parole Bd.*, 98 A.3d 544, 559 (N.J. 2014); *see also id.* (holding that New Jersey's equivalent of LEM deprives the people subject to it "of freedom of movement and the ability to live and work as other citizens, with no supervision" (quotation marks omitted)). This places substantial limitations on a person's freedom of movement by preventing them from engaging in certain recreational activities like camping, or from accepting certain types of employment, such as long-haul truck driving or working in a concrete warehouse with poor GPS reception. The majority argues that such restrictions are insufficient to be custodial because "Corridore can go where he wants, so long as he keeps the device charged and tracking." Maj. Op. at 9. But that ignores the fact that keeping the device charged and connected to GPS creates substantial restraints on Corridore's freedom of movement.

The Supreme Court, moreover, has concluded that if government officers "may demand [a person's] presence at any time and without a moment's notice," then that person is subject to severe restraints on their liberty. *Hensley*, 411 U.S. at 351. A person subject to LEM must "make [themselves] *immediately* available" to MDOC staff in the event that certain problems occur with the device, many of which may be beyond the person's control. LEM Rules at 2 (emphasis added). This is almost indistinguishable from the restraint described as custodial in

*Hensley*. And it is certainly more than a mere "incidental effect on movement," as the majority claims. Maj. Op. at 10.

Additionally, in *Lawrence*, this court concluded that, for the purposes of determining what constitutes being in custody, the difference between reporting and non-reporting probation "is a distinction without a difference," because both give the government "supervisory authority over a petitioner." 560 F.3d at 480 n.5. The same is true for LEM: continuous and permanent real-time monitoring of a person's every movement constitutes supervisory authority over that person, particularly given that failure to comply with the requirements of LEM constitutes a felony. Mich. Comp. Laws Ann. § 750.520n.

Other factors also demonstrate that LEM is not—as the majority claims—merely a collateral consequence of Corridore's conviction. LEM was imposed as a mandatory part of Corridore's sentence, because Michigan law states that a court "*shall sentence* the defendant to lifetime electronic monitoring" for a conviction of second-degree criminal sexual conduct "if the violation involved sexual contact committed by an individual 17 years of age or older against an individual less than 13 years of age." Mich. Comp. Laws Ann. § 750.520c(2)(b) (emphasis added). The Michigan Supreme Court has confirmed that LEM is part of a defendant's sentence and, in doing so, also confirmed that LEM meets another factor that this court has previously considered: whether the relevant statute is remedial or punitive in nature. *People v. Cole*, 817 N.W.2d 497, 503 (Mich. 2012). In *Cole*, the state supreme court held that LEM is "a punishment and part of the sentence itself" and thus constitutes a "direct consequence" of a conviction, not a mere collateral consequence. *Id.* The court had been asked to consider whether a trial court is required by due process to inform a defendant that mandatory LEM is a consequence of a guilty plea, and thus the court had to determine whether LEM is a direct or merely collateral consequence of a plea. *Id.* at 501. The Michigan Supreme Court's characterization of Michigan law is deserving of deference and militates in favor of finding that LEM constitutes a significant restraint on liberty that is therefore custodial.

Other courts have also noted "the additional punitive effect" of social stigma, shame, and ostracism resulting from wearing an LEM device, which is a visible marker of a person's connection with crime. *Commonwealth v. Goodwin*, 933 N.E.2d 925, 935 (Mass. 2010) (quoting

*Commonwealth v. Cory*, 911 N.E.2d 187, 196 n.18 (Mass. 2009)); *see also Commonwealth v. Norman*, 142 N.E.3d 1, 9 (Mass. 2020); *Riley*, 98 A.3d at 559 ("The tracking device attached to Riley's ankle identifies Riley as a sex offender no less clearly than if he wore a scarlet letter."). People subject to LEM are therefore required to submit to conditions that "significantly restrain [their] liberty to do those things which in this country free men are entitled to do," and are therefore in custody for the purposes of federal habeas jurisdiction. *Jones*, 371 U.S. at 243.

The majority believes that whether the statute is punitive in nature does not affect our "in custody" analysis. But that plainly misreads this court's precedents. This court has previously looked at whether the relevant statute "is remedial as opposed to punitive in nature," because another court's determination that the statute "is a form of civil regulation provides additional support" for a conclusion that the restraint is more analogous to a collateral consequence. *Leslie*, 296 F.3d at 522–23. It is true that the analysis for an ex post facto challenge considers different factors than the "in custody" analysis for federal habeas jurisdiction, and this court previously has declined to conflate the two lines of cases. *See Hautzenroeder*, 887 F.3d at 744 ("[T]he two issues pose different legal questions."). But that does not mean that the question of whether the statute is punitive in nature is irrelevant to this court's custody requirement analysis. It simply means that although a prior ex post facto decision may inform an analysis of the factors for determining custody, the ultimate holding is not dispositive of the current question.

In reaching its decision to the contrary, the majority relies in part on a Ninth Circuit case, *Munoz v. Smith*, 17 F.4th 1237 (9th Cir. 2021), which considered whether Nevada's LEM program was custodial for purposes of federal habeas jurisdiction. But *Munoz* is inapposite for several reasons. First, *Munoz* did not involve restraints stemming from *both* LEM and the sex-offender registry, as is the case here. Second, the court in *Munoz* discussed *Piasecki*, a Third Circuit case that held that the restrictions of Pennsylvania's sex-offender registry were custodial, and determined that "*Piasecki*'s analysis was consistent" with that of the *Munoz* court. 17 F.4th at 1244. Because Michigan's Sex Offenders Registration Act ("SORA") is analogous to the Pennsylvania act, *see infra* Part III.C, that statement suggests that the *Munoz* court would have found the combined restrictions of LEM and a statute similar to SORA to be custodial.

Additionally, *Munoz* did not examine certain factors that this court has considered in determining whether restraints are custodial, such as whether the relevant statute "is remedial as opposed to punitive in nature," and thus *Munoz* is inconsistent with this court's prior precedents. *Leslie*, 296 F.3d at 523. Finally, unlike LEM in Michigan, the *Munoz* court determined that Nevada's electronic monitoring "does not limit [the petitioner's] physical movement, nor does it require him to go anyplace." 17 F.4th at 1245. As mentioned above, in addition to the physical limitations stemming from the charging and GPS connectivity requirements, a person subject to LEM in Michigan must "make [themselves] *immediately* available" to MDOC staff under certain circumstances. *Munoz*'s analysis therefore does not undermine my conclusion that Michigan's LEM program constitutes a significant restraint on Corridore's liberty and is thus custodial. LEM Rules at 2 (emphasis added). I would therefore hold that being subject to LEM alone, even absent the burdens of SORA, is sufficient to place an individual "in custody" for purposes of federal habeas jurisdiction.

## III. SEX OFFENDER REGISTRATION IN MICHIGAN

### A. Forfeiture and Certificate of Appealability

The majority argues that Corridore forfeited the portion of his argument regarding SORA and that the district court's certificate of appealability applies to only the issue of whether LEM constitutes custody for purposes of federal habeas jurisdiction. Maj. Op. at 11–12. This misconstrues both Corridore's arguments in the district court and the district court's certificate of appealability.

First, Corridore argued in his petition that he would be in custody for the rest of his lifetime because he "remains under twin burdens for life: lifetime electronic monitoring (LEM) and sex offender registration (SOR)." R. 1 (Habeas Pet. Br. at 10) (Page ID #28). Although Corridore stated in his brief in support of his petition that the Sixth Circuit had found that the requirements of Ohio's sex offender registry did not constitute custody, citing *Hautzenroeder*, 887 F.3d at 740, he did not concede that the burdens of SORA in combination with LEM do not constitute custody. *Id.* at 11 (Page ID #29). Thus, at most Corridore forfeited the argument that SORA alone constituted custody.

Likewise, nothing in the text of the district court's certificate of appealability suggests that Corridore's argument about the combined restraints of LEM and SORA is not properly before this court. *See* R. 8 (Op. & Order at 11) (Page ID #1920). The entirety of the district court's order on that point states: "The Court, nevertheless, **GRANTS** a certificate of appealability on Petitioner's first claim as to whether Petitioner is in custody for purposes of habeas relief and whether this Court properly granted Respondent's motion to dismiss the petition." *Id.* The certificate of appealability thus encompassed the entirety of Corridore's claim about custody, which included his argument regarding the twin burdens of LEM and SORA. This court therefore can consider Corridore's argument about the combined restraints of LEM and SORA. Although for the reasons stated above I believe that the restraints of LEM alone suffice to constitute custody for the purposes of federal habeas jurisdiction, and I would decide this case solely on that issue, I address Corridore's arguments regarding the combined restraints of LEM and SORA in order to respond to the majority's misperceptions of SORA and this court's related caselaw.

**B. Michigan's Sex Offenders Registration Act**

The Michigan Supreme Court has described SORA as "a publicly accessible database that impose[s] significant restrictions on the lives of registrants" and that "bears significant resemblance to the traditional punishments of banishment, shaming, and parole because of its limitations on residency and employment, publication of information and encouragement of social ostracism, and imposition of significant state supervision." *People v. Betts*, 968 N.W.2d 497, 501, 510 (Mich. 2021). We have also described SORA as "a byzantine code governing in minute detail the lives of the state's sex offenders." *Does #1–5 v. Snyder*, 834 F.3d 696, 697 (6th Cir. 2016).

SORA registrants who are classified as tier III offenders must report in person four times a year according to a fixed schedule based on the registrant's birth month in order to verify certain personal information and ensure that a current photograph exists on file. Mich. Comp. Laws Ann. §§ 28.725a(3)(c), (5). In addition to the scheduled reporting, registrants must report changes to their name, residence, domicile, place of employment, and enrollment status in higher

education in person to the Michigan State Police ("MSP")[1] within three business days of the change.  *Id.* §§ 28.725(1), 28.724a.  Registrants must also report changes to vehicle information, email addresses, internet identifiers,[2] or telephone numbers either registered to or used by the registrant within three business days.  *Id.* § 28.725(2)(a).  Likewise, if a registrant "intends to temporarily reside at any place other than his or her residence for more than 7 days," they must report such information to MSP within three business days.  *Id.* § 28.725(2)(b).  If a registrant wishes to change their domicile or residence to another state, they must report to MSP in person three days prior to the change.  *Id.* § 28.725(7).  A registrant must report to MSP in person twenty-one days prior to traveling to another country for more than seven days or changing their domicile or residence to another country.  *Id.* § 28.725(8).

A substantial portion of the information that must be reported is also made publicly available on a website maintained by MSP.  *Id.* § 28.728(2).  Publicly available information about a tier II or tier III registrant includes:  legal name, aliases, nicknames, former names, date of birth, residential address, employer's address, the address of schools being attended or that the individual plans to attend, license plate number and description of any vehicle owned or operated by the individual, summary of convictions, complete physical description, photograph, registration status, and the provision defining the offense for which the individual is registered. *Id.*

In addition to the reporting requirements, SORA registrants must maintain a valid Michigan driver's license or state personal identification card, unless the registrant is homeless, as defined by the statute.  *Id.* § 28.725a(7).  A willful violation of most SORA provisions constitutes a felony offense.  *Id.* § 28.729(1).  The first conviction for a SORA violation is punishable "by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both."  *Id.* § 28.729(1)(a).  A second conviction is punishable "by imprisonment for not more than 7 years or a fine of not more than $5,000.00, or both," and any subsequent conviction is

---

[1]SORA defines "department" as referenced in section 28.725 as "the department of state police."  MICH. COMP. LAWS ANN. § 28.722(c).

[2]SORA defines "internet identifier" as including "all designations used for self-identification or routing in internet communications or posting."  MICH. COMP. LAWS ANN. § 28.722(g).

punishable "by imprisonment for not more than 10 years or a fine of not more than $10,000.00, or both." *Id.* § 28.729(1)(b)–(c). A willful failure to comply with the requirement to report in person four times a year constitutes a misdemeanor offense punishable "by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both." *Id.* § 28.729(2). Willful violations of SORA also result in the mandatory revocation of probation or rescission of parole, if applicable. *Id.* § 28.729(5), (7). Tier III offenders like Corridore must comply with SORA until they die. *Id.* §§ 28.722(u)(*ii*), 28.722 (v)(*v*), 28.725(13).

## C. SORA and the "in Custody" Requirement

SORA's requirements, in combination with LEM, constitute a significant restraint on Corridore's liberty and thus he is "in custody" for purposes of federal habeas jurisdiction. The extensive reporting requirements mandated by SORA represent physical restraints on a registrant's liberty in the same way that probation and parole do. *Cf. Does #1–5*, 834 F.3d at 703 ("SORA's requirements are more intrusive and more difficult to comply with than . . . probation."). As the Michigan Supreme Court has explained:

> [I]t belies common sense to suggest that a . . . lifetime obligation to report to a police station every ninety days to verify one's identification, residence, and school, and to submit to fingerprinting and provide a current photograph, is not a substantial disability or restraint on the free exercise of individual liberty.

*Betts*, 968 N.W.2d at 511–12 (alteration in original) (quoting *State v. Letalien*, 985 A.2d 4, 24–25 (Me. 2009)). And "[g]iven the ubiquity of the Internet in daily life, th[e] requirement [to report changes to email addresses and internet identifiers] might . . . be[] triggered dozens of times within a year." *Id.* at 511.

The Third Circuit's decision in *Piasecki* is particularly instructive in analyzing the restraints imposed by SORA. In *Piasecki*, the Third Circuit considered Pennsylvania's Sex Offender Registration and Notification Act, which imposes substantially similar registration requirements on registrants to Michigan's SORA. 917 F.3d at 164–65. Like SORA, Pennsylvania law requires tier III offenders to register in-person four times a year for the rest of their lives. *Id.* at 164. Pennsylvania registrants must also appear in person to report changes to the same categories of information as required by SORA. *Id.* Likewise, Pennsylvania registrants

must report international travel in person at least twenty-one days prior to their departure. *Id.* at 165. The sole additional Pennsylvania requirement not imposed by SORA is that, if a registrant becomes homeless, they must appear in person monthly to be photographed. *Id.* SORA, however, imposes additional burdens on registrants not imposed on the petitioner in *Piasecki*, by making substantial portions of the registrant's information publicly available, and by requiring registrants to maintain a Michigan driver's license or state ID card. *Compare id.* ("The parties do not dispute that Piasecki was subject to these restrictions—and only these restrictions—when he filed his § 2254 petition."), *with* Mich. Comp. Laws Ann. §§ 28.728(2), 28.725a(7). The petitioner in *Piasecki* also was not subject to the additional burdens of LEM. The Third Circuit nevertheless held that the registration requirements of Pennsylvania's statute sufficiently restrained the petitioner's liberty such that he was "in custody" for purposes of federal habeas jurisdiction. *Piasecki*, 917 F.3d at 177.

In reaching its conclusion, the Third Circuit found that the question of custody was "easily answered" as a result of the four times per year lifetime reporting requirement, because "[t]he state's ability to compel a petitioner's attendance weighs heavily in favor of concluding that the petitioner was in custody." *Id.* at 170. Additionally, the extensive in-person reporting requirements regarding the petitioner's personal information constituted "compulsory, physical 'restraints "not shared by the public generally."'" *Id.* at 171 (quoting *Hensley*, 411 U.S. at 351). The Third Circuit "easily conclude[d] that the restrictions . . . were 'severe'" because, as with Michigan's SORA, a failure to comply with Pennsylvania's registration requirements constituted a felony offense, which the court analogized to the restrictions in *Hensley*. *Id.* The Third Circuit conceded that although several other circuits had previously held that the requirements of sex-offender registry statutes were not custodial, newer statutes like Pennsylvania's act had increasingly "onerous" requirements that were not previously mandated. *Id.* at 172. Likewise, many of those decisions were based in part on the fact that "the respective state courts ha[d] determined that their state registration schemes [were] remedial, not punitive," whereas "Pennsylvania courts have concluded otherwise." *Id.* at 173–74. Given the overwhelming similarities between the statutes, *Piasecki*'s well-reasoned conclusions apply with equal force to Michigan's SORA.

The majority's reliance on *Hautzenroeder* is inapposite.  It is true that *Hautzenroeder* held that the restrictions of Ohio's sex offender registry statute were not custodial.  887 F.3d at 741.  *Hautzenroeder*, however, did not consider the cumulative burdens of sex-offender registry and LEM.  And the petitioner in *Hautzenroeder* claimed only that the requirements of registry "chill[] registrants' freedom of movement," *id.*, whereas Corridore has demonstrated that both LEM and the reporting requirements of SORA represent physical restraints on his liberty.  Ohio's sex-offender registration scheme, as reviewed in *Hautzenroeder*, is not "almost identical" to SORA as the majority claims, Maj. Op. at 13, because the Ohio scheme did not involve in-person reporting requirements, unlike the burdensome in-person reporting requirements of SORA.  And at least one other circuit has recognized that the conditions imposed by Pennsylvania's act—and therefore also by Michigan's SORA—were substantially more onerous than those addressed in prior sex-offender registry cases.  *Munoz*, 17 F.4th at 1244 ("*Piasecki* involved much more burdensome conditions than those addressed in our prior cases. . . . *Piasecki*'s analysis was consistent with our own precedent, but simply confronted far more severe restrictions than those we have addressed in our past cases.").

Additionally, Michigan courts have held that although "sex offender registration is not a criminal sanction, . . . it is a particularly severe penalty."  *People v. Fonville*, 804 N.W.2d 878, 894 (Mich. Ct. App. 2011).  In holding that defense counsel must inform their clients that sex-offender registration will be a consequence of a guilty plea, the Michigan Court of Appeals concluded that "sex offender registration is 'intimately related to the criminal process,'" and that "[t]he 'automatic result' of sex offender registration for certain defendants makes it difficult 'to divorce the penalty from the conviction.'"  *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 365–66 (2010)).  The court thus distinguished "the unique and mandatory nature of the specific consequence of the sex-offender-registration requirement from the common, potential, and incidental consequences associated with criminal convictions."  *Id.* at 895.  As with the Michigan Supreme Court's conclusions regarding LEM, this suggests that SORA registration too is more than a mere collateral consequence of a conviction.

Our decision in *Does #1–5* also supports such a conclusion.  In that case, we considered a prior version of SORA that was substantially similar to the current version, with the sole

additional restriction preventing registrants from "living, working, or 'loitering' within 1,000 feet of a school." *Does #1–5*, 834 F.3d at 698. We concluded that "SORA . . . resembles the punishment of parole/probation," that "it meets the general definition of punishment," and that its "restrictions put significant restraints on how registrants may live their lives." *Id.* at 703. Thus, "Michigan's SORA imposes punishment." *Id.* at 705. Our precedents thus bolster my conclusion that SORA is not a mere collateral consequence, but a significant restraint on registrants' liberty. The Michigan Court of Appeals reached the same conclusion when considering the current version of SORA, holding that "the 2021 SORA's aggregate punitive effect negates the Legislature's intention to deem it a civil regulation. As a result, requiring an individual to comply with the 2021 SORA imposes a criminal punishment on a registrant." *People v. Lymon*, ——N.W.2d——, No. 327355, 2022 WL 2182165, at *14 (Mich Ct. App. June 16, 2022), *leave to appeal granted*, 983 N.W.2d 82 (Mich. 2023). Thus, considering the cumulative burdens of LEM and SORA registration, I believe that Corridore has demonstrated that there are significant restraints on his liberty such that he is "in custody" for the purposes of federal habeas jurisdiction.

## IV.  CONCLUSION

The majority's opinion wrongfully forecloses Corridore from raising challenges to the constitutionality of his conviction and sentence in federal habeas proceedings. Accordingly, I would reverse the district court's judgment dismissing Corridore's habeas petition and remand for further proceedings. Because an individual should not be subject to the significant restraints on their liberty posed by LEM and lifetime registration as a sex offender without recourse to a writ of habeas corpus to challenge whether those restraints were constitutionally applied, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1301

FRANK CORRIDORE,

     Petitioner - Appellant,

     v.

HEIDI E. WASHINGTON, Warden,

     Respondent - Appellee.

> **FILED**
> Jun 23, 2023
> DEBORAH S. HUNT, Clerk

Before:  MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk